410 So.2d 827 (1982)
William E. RYALS, Sr., et al., Individually and as Administrator of the Estate of the Minor, William E. Ryals, Jr., Plaintiffs & Appellants,
v.
HOME INSURANCE COMPANY, et al., Defendants & Appellees.
No. 8578.
Court of Appeal of Louisiana, Third Circuit.
February 3, 1982.
Rehearings Denied March 23, 1982.
*829 Davis & Simmons, James L. Davis and Kenneth N. Simmons, Many, for plaintiffs & appellants.
Cook, Yancey, King & Galloway, Herschel R. Richard, Jr., Shreveport, for defendants & appellees.
Before CULPEPPER, FORET and CUTRER, JJ.
CULPEPPER, Judge.
This is a personal injury suit filed by the parents of a child, Eddie Ryals, who was injured when he was caught in the pumping unit of an oil well owned and operated by defendant's insured, Alpha Oil & Gas Company, Inc. (hereinafter Alpha). Suit was filed September 16, 1980 against Home Insurance Company, Alpha's liability insurer, and two individual employees of Alpha, for medical expenses, the child's personal damages, and damages for the mental and emotional distress of the parents. The trial court sustained defendants' exception of no cause of action to the parents' claim for damages for their mental and emotional distress. After a lengthy trial, the jury returned a verdict in favor of the plaintiffs awarding $100,000 for the child's damages and $58,000 in medical expenses. From the judgment rendered in accordance with the verdict, plaintiffs appeal. Defendant Home Insurance Company answered the appeal.
Numerous issues are urged for our consideration. Plaintiffs' substantial contentions are as follows:
1) That the parents' claim for their mental and emotional distress suffered as a result of their child's injuries should be allowed;
2) That the following conduct by the trial judge amounted to a comment on the evidence and/or was an expression of his opinion to the jury:
(a) Exclusion of photographs of the child sought to be introduced as evidence of his pain and suffering;
(b) Omission of an interrogatory to the jury concerning the issue of attractive nuisance;
(c) The judge's offer to submit to the jury a written copy of jury instructions;
(d) The allowance of a recess between the charge to the jury and the submission of the case to the jury, for the purpose of correcting a verdict interrogatory;
(e) The inadequacy of jury instructions concerning the effect of the parents' negligence on the child's recovery and *830 the omission of a charge as to the credit due the insurance company against any award of medical expenses;
3) That the jury erred in its finding that the individual defendants, E. B. McCaslin and Cecil Sepulvado, were not negligent;
4) That the jury's award of $100,000 for the child's damages was so low as to constitute an abuse of the jury's discretion;
5) That the trial court erred in denying plaintiffs' motion for an additur or, in the alternative, a new trial;
6) That the trial court erred in excluding testimony, affidavits and statements by the jurors sought to be introduced on the motion for a new trial for the purpose of impeaching the jury verdict;
7) That the conduct of the trial court constituted deprivation of plaintiffs' right to due process of law and equal protection of the laws.
Defendant, Home Insurance Company, contends the jury erred in finding that Alpha was negligent, that there was no negligence on the part of Eddie's parents, Mr. and Mrs. Ryals, and also in finding that Eddie himself was not contributorily negligent.

FACTS
The facts are these. Alpha Oil & Gas Company owns and operates an oil well located in Block 19 of the town of Converse, Louisiana. Defendant McCaslin is the superintendent in charge of Alpha's operations in the Converse area. The actual production by the well in question is attended to by defendant Sepulvado, a pumper employed by Alpha.
The well is a "stripper", producing approximately one barrel of oil per week. Because the well runs out of oil after pumping a certain length of time, it is operated on an automatic time clock, set so that the pump will begin pumping at certain hours during the day, pump for a certain length of time, and then turn off. The schedule is determined by the pumper responsible for the operation and gauging of the well. This well is located behind the backyard of the mobile home in which Eddie Ryals and his parents reside, also in Block 19 in Converse, only a little over 200 feet away from the home. There was no fence around the well, no warning sign or other devices to indicate that the pump was operated by an automatic time clock and subject to being activated automatically and without warning at a given moment.
On September 24, 1979, Eddie, 8 years old at the time, and his sister, Angela, age 10 at the time, went into the wooded, overgrown area behind their house in search of birds. In the course of their search, they wandered into the area around the pumping unit. Eddie climbed onto the pumping unit, which was shortly thereafter activated by the time clock. His lower body was caught in the mechanism and he was thrown around and around, receiving severe injuries.
His sister pulled him out of the pump. He was rushed first to the Converse hospital and then to Schumpert's Medical Center in Shreveport, where he remained hospitalized until November 12, 1979. He suffered serious, life-threatening complications and permanent disability.

CLAIM FOR MENTAL AND EMOTIONAL DISTRESS
The first issue addressed is the plaintiffs' contention that the trial court erred in sustaining the defendants' exception of no cause of action to the claims of William E. Ryals, Sr. and Betty Ryals for damages for their mental and emotional distress as a result of the injuries to their child. The rule has long been established in Louisiana that there can be no recovery for emotional distress or mental suffering resulting from personal injuries sustained by another person. Black v. Carrollton Railroad, 10 La.Ann. 33 (La.1855); Sperier v. Ott, 116 La. 1087, 41 So. 323 (La.1906). Despite the criticism of the long line of jurisprudence echoing this rule, [See Stone, Ferdinand F., La.Civ. Law Treatise Tort Doctrine, Vol. 12, Secs. 170-171 (1977)], the *831 Louisiana Supreme Court's consistent denial of writ applications in cases holding such mental anguish and suffering to be noncompensable necessitates our conclusion that this rule of law is still controlling. Wascom v. American Indemnity Corporation, 348 So.2d 128 (La.App. 1st Cir. 1977), writ denied 350 So.2d 1224 (La.1977); Steele v. St. Paul Fire & Marine Insurance Company, 374 So.2d 658 (La.1979); Parker v. St. Paul Fire & Marine Insurance Company, 338 So.2d 700 (La.1976). See also Brauninger v. Ducote, 381 So.2d 1246 (La. App. 4th Cir. 1980); Bertrand v. State Farm Fire & Casualty Company, 333 So.2d 322 (La.App. 3rd Cir. 1976). Any departure therefrom must come from the Supreme Court. Therefore, we affirm the trial court's judgment denying these plaintiffs recovery for mental and emotional distress as a result of their son's accident and injuries.

CONDUCT OF THE TRIAL JUDGE
We turn now to a consideration of the plaintiffs' assignments of error dealing with rulings, actions and omissions by the trial judge, which they contend either prejudiced or confused the jury.
Plaintiffs attempted to introduce certain photographs of Eddie for the purpose of proving the child's pain and suffering. The trial court refused to allow introduction of the pictures on the grounds that they were inflammatory and the prejudicial effect outweighed any relevancy they had, since they would have been cumulative to other pictures already in evidence. Plaintiffs argue that the photographs were necessary to show the full extent of Eddie's injuries and pain and suffering, and that their exclusion contributed to the jury's rendering an inadequate award.
This is an area in which the trial judge is vested with discretion in the determination of the weight to be accorded the probative value of the evidence sought to be introduced. State v. Redwine, 337 So.2d 1041 (La.1976). We find no abuse of that discretion in the exclusion of these photographs. Other photographs taken of the child during his hospitalization had already been admitted into evidence, thus greatly diminishing the probative value of the pictures in question.
The plaintiffs further claim it was error to omit an interrogatory to the jury on the issue of whether or not the well was an attractive nuisance. They contend that it constituted a comment on the evidence, inasmuch as it indicated to the jury the judge's opinion that it was not an attractive nuisance.
LSA-C.C.P. Article 1811 authorizes the use of special verdicts and further provides that:
"If the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue omitted unless, before the jury retires, he demands its submission to the jury."
A careful review of the record reveals that counsel for both parties had an opportunity to review the special questions to the jury and make objections. It further reveals that none was made by counsel for plaintiffs. Thus, they are deemed to have waived trial by jury on the issue of attractive nuisance. The jury found as a fact that the pumping jack created an unreasonable risk of harm to Eddie Ryals, and that Alpha was guilty of negligence which proximately caused his injuries. In light of the verdict in plaintiffs' favor assessing liability against the defendant-insurer, we cannot say that the omission influenced the jury so adversely to the plaintiffs as to warrant reversal.
We also find no merit to the plaintiffs' contentions regarding errors in the trial court's charge to the jury. The claim that the recess taken at lunch time, for the purpose of making a correction in the special verdict, confused the jury is rejected as insufficient for reversal, inasmuch as counsel for plaintiffs made no objection to the procedure. It is also noted that the provisions on procedure for jury trials in our Code of Civil Procedure neither authorize nor prohibit such a practice. There was *832 complete instruction on the law applicable to the case before the recess was taken, and a repetition of general instructions upon return to the courtroom. The jury was informed that they could request further instruction if necessary, but did not do so. We do not hold that such a practice could not, under some circumstances, create such confusion that reversal might be warranted. However, in the instant case, this contention is without merit.
Likewise, the contention that the jury was prejudiced against the plaintiffs because of their counsel's objection to the trial judge's attempt to give to the jury a copy of the charges is meritless, inasmuch as both counsel pointed out the impropriety of such an action. In point of fact, the record shows that defense counsel was first to point it out.
As to the plaintiffs' claims regarding the inadequacy of certain charges to the jury, and the omission of the charge dealing with the insurer's right to reimbursement of approximately $44,000 of medical expenses already paid by it, we find in the record no objection by counsel to the omissions, as required by LSA-C.C.P. Article 1793 which reads as follows:
"Art. 1793. Instruction to jury; objections
At the close of the evidence or at an earlier time during the trial as the court reasonably directs, a party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury.
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."
See also Kolmaister v. Connecticut General Life Insurance Company, 370 So.2d 630 (La.App. 4th Cir. 1979), writ denied 373 So.2d 531 (La.1979); Druilhet v. Comeaux, 317 So.2d 270 (La.App. 3rd Cir. 1975), writ denied 321 So.2d 363 (La.1975); Williams v. City of Alexandria, 376 So.2d 367 (La.App. 3rd Cir. 1979), writ denied 378 So.2d 432 (La.1979). This assignment of error is also rejected.

NEGLIGENCE OF THE INDIVIDUAL DEFENDANTS
The jury found that neither of the individual defendants, E. B. McCaslin and Cecil Sepulvado, was guilty of negligence in performing their duties as employees of Alpha. Plaintiffs urge that this finding should be set aside as being contrary to the evidence adduced at trial. As this is a factual finding by the jury, it cannot be reversed on appeal unless it is shown to be clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The criteria for imposing individual liability upon the agent, supervisor or employee of a corporate employer is set out in Canter v. Koehring Company, 283 So.2d 716 (La. 1973), at page 721:
"1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. * * *
4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages."
The plaintiffs failed in the present case to bear the burden of proving by a preponderance of the evidence that these defendants had the authority and had been *833 delegated the duty to oversee the safety aspects of the well in question. As to defendant Sepulvado, the only evidence adduced to show his employment duties, as pumper in charge of the well, was his own testimony that he was responsible only for actually operating the well, for seeing that the pump was operating properly, and for gauging the well to determine how much oil was being produced.
Defendant McCaslin is the superintendent of operations running Alpha's Converse office. He was in charge of production, drilling and maintenance. There was no evidence to show who, if anyone, within the hierarchy of Alpha's organization had actual responsibility for the safety aspects of the operation. There were apparently two positions in the company with authority over Mr. McCaslin's operational activities his immediate superior and the owner-president of the company. However, there was nothing to show that either of these persons had ever delegated to this defendant, or to anyone, the duties of overseeing the safety aspects of operations. The jury's conclusion that these defendants breached no duty toward Eddie Ryals is further strengthened by the unrebutted testimony of defendant McCaslin that he had no authority to make any expenditures on behalf of Alpha other than those necessary for routine production and maintenance. We do not find the jury clearly wrong in its exculpation of these defendants.

MISCONDUCT OF THE JURYMOTION FOR NEW TRIAL
At the hearing on the plaintiffs' motion for a new trial, they attempted to introduce evidence of jury misconduct, claiming that the members of the jury considered facts not in evidence which resulted in a compromise verdict contrary to the law and the evidence. The proffered evidence was in the form of affidavits, statements and testimony of the jurors themselves as to their deliberations in the jury room, tending to show that some felt the parents were negligent. The trial judge rejected both the evidence and the plaintiffs' motion for a new trial.
The plaintiffs now urge on appeal that the alleged conduct of the jury constitutes error sufficient to require reversal of the verdict by this court, and that the trial judge's exclusion of the evidence and consequent denial of a new trial is reversible error.
The contention is that the statements by the jurors show that they considered facts not in evidence, and are admissible to prove that the jury members gave incorrect answers on voir dire examination. Plaintiffs also argue that the jury violated the oath to render an impartial verdict according to the law and the evidence. They rely on this court's decision in Rains v. Diamond M. Company, 396 So.2d 306 (La.App. 3rd Cir. 1981), wherein we recognized the distinction between the impeaching of the jury verdict and attempting to ascertain whether the jurors responded truthfully on voir dire. We there held the testimony of jurors should have been admitted for the latter purpose, while recognizing the general rule prohibiting the admissibility of statements of jurors to impeach their own verdict. See Renz v. Texas & Pacific Railway Company, 138 So.2d 114 (La.App. 3rd Cir. 1962); Lachney v. Jones, 373 So.2d 595 (La.App. 3rd Cir. 1979), writ denied 376 So.2d 959 (La.1979); Washington v. Lake City Beverage, Inc., 352 So.2d 717 (La.App. 3rd Cir. 1977), writ denied 354 So.2d 1050 (La.1978).
LSA-C.C.P. Article 1814 provides:
"Art. 1814. New trial on showing of misconduct by jury
A new trial shall be granted if it be proved that the jury was bribed or has behaved improperly so that impartial justice has not been done."
We recognize that, as stated in Blandino v. Brown Erection Company, Inc., 341 So.2d 577, 580 (La.App. 2d Cir. 1977):
"Improper behavior by a juror is not defined but must be determined by the facts and circumstances of the particular case."
The behavior alleged here to be improper does not involve the attempt to ascertain *834 the objective truthfulness of jurors' answers on voir dire so much as it does the use of the proffered evidence to impeach the verdict of this jury.
The public policy reason behind the rule against jurors being permitted to impeach their verdict was stated in Renz v. Texas & Pacific Railway Company, supra:
"The rule is founded on public policy, and is for the purpose of preventing litigants or the public from invading the privacy of the jury room, either during the deliberations of the jury or afterwards. It is to prevent over-zealous litigants and a curious public from prying into deliberations which are intended to be, and should be, private, frank, and free discussions of the questions under consideration. Further, if after being discharged and mingling with the public, jurors are permitted to impeach verdicts which they have rendered, it would open the door for tampering with jurors and would place it in the power of a dissatisfied or corrupt juror to destroy a verdict to which he had deliberately given his assent under sanction of oath.
"Testimony of the jurors to impeach their own verdict is not excluded because it is irrelevant to the matter in issue, but because experience has shown that it is more likely to prevent them to promote the discovery of the truth. Hence, the affidavit of a juror cannot be admitted to show anything relating to what passed in the jury room during the investigation of the cause, or the effect of a colloquy between the court and a juror, or the arguments made to a juror by a fellow juryman."
Were we to accept the plaintiffs' argument, any party who feels the jury verdict should have been different could raise the claim that the jury members were untruthful in stating that they could and would render an impartial judgment.
For these reasons, we reject plaintiffs' contention of jury misconduct and affirm the trial court's exclusion of the statements and testimony of the jurors at the hearing on the motion for a new trial. We thus find that the trial judge's denial of a new trial on the grounds of jury misconduct was correct.

QUANTUM
The plaintiffs' contentions with respect to the issue of quantum revolve around the claim of jury misconduct in considering the facts not in evidence, which consideration resulted in a patently inadequate recovery granted to the child. They argue that because some of the jurors felt that Eddie's parents were negligent, the amount of the award was compromised and reduced to a figure so inadequate as to constitute an abuse of the much discretion afforded the trial court on the measure of damages under LSA-C.C. Article 1934. For this reason, a motion for additur or new trial was filed in the lower court, pursuant to LSA-C.C.P. Article 1813 which reads as follows:
"Art. 1813. Remittitur or additur as alternative to new trial; reformation of verdict
If the trial court is of the opinion that the verdict is so excessive or inadequate that a new trial should be granted for that reason only, it may indicate to the party or his attorney within what time he may enter a remittitur or additur. This remittitur or additur is to be entered only with the consent of the plaintiff or the defendant as the case may be, as an alternative to a new trial, and is to be entered only if the amount of the excess or inadequacy of the verdict or judgment can be separately and fairly ascertained. If a remittitur or additur is entered, then the court shall reform the jury verdict or judgment in accordance therewith."
As indicated above, the trial court rejected the plaintiffs' motion, both for additur and for new trial. Plaintiffs thus claim that both judge and jury abused their discretion with respect to the issue of quantum. We agree.
We recognize that, under Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977);
"... before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the *835 trier of fact abused its discretion in making its award. (citations omitted) Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. (citations omitted.)"
The injuries and illness suffered by this young child were varied and extremely severe. He sustained open fractures of both the femur and the tibia of his right leg, requiring that they be set with pins and external fixation devices. A bone graft was required to be performed on the tibia because it failed to heal. The blood supply to the left leg was cut off for several hours, as a result of damage to the artery and the veins, which required immediate grafting to repair the damage. This leg subsequently required several fasciotomies, splitting of the skin on the leg to relieve the pressure from inner swelling. Both legs were kept in casts for four months after the accident. He was in a body cast for two months after the bone graft was performed on the tibia. His right leg remained in one kind of cast or another until over a year after the accident, and he was still wearing a short leg brace on it at the time of trial, fifteen months after the accident. The prognosis is that this leg will ultimately be brace-free, but there will be restriction of the ankle motion, and growth is probably stunted. A turning out of the ankle, which is a result of the damage to the bones' growth centers, has already been noted, and it is more than likely that corrective surgery will be required. There was conflicting testimony as to the extent of permanent nerve damage in the left leg. One expert testified that he found a complete conduction block, meaning that there can be no function of the muscle involved in lifting the foot and toes. Defendants' expert testified that he noted a slight activity in this muscle. However, improvement is unlikely since it had been over a year since the accident. He will therefore always have to wear a brace on his left leg, or undergo further surgery to fuse the ankle.
Eddie also suffered a ruptured bladder. His kidneys failed to function, requiring weeks of peritoneal dialysis. He contracted several infections, including Salamonella in his blood stream.
Of course, he is scarred from the waist down. He missed an entire year of school and is no longer able to participate normally in athletic activities, as he did before the accident.
This child was hospitalized six times for a total of 90 days, underwent ten different surgical procedures, and incurred medical bills totaling $58,000. His doctors testified that he suffered such extreme physical pain that the strongest of medications would not relieve it. A psychologist testified that, at the time of trial, Eddie was suffering from mental and emotional problems connected with the accident.
Eddie is permanently disabled from performing any work requiring heavy lifting, bending, stooping, twisting or climbing. His IQ of 85 places him in the category of "Dull normal", a person who would in the normal course of things be expected to earn his living by performing heavy manual labor. The only type of work now suitable for him would be of a sedentary or semi-sedentary nature.
The great weight of expert testimony was that Eddie will more than likely be relegated to a job with lower compensation as a handicapped person than he would have been able to secure had he not been disabled. Defendants' vocational expert testified that he felt, from studying the testing done of Eddie's mental ability, Eddie was trainable for certain jobs which do pay higher than the minimum wage. However, he also testified that the great majority of the jobs in the area around Eddie's home involve manual labor and that Eddie's future employability is greatly decreased as a result of his handicap. Most of the jobs he felt Eddie could perform despite his handicap, and receive higher than the minimum wage, require training and math and reading skills. It is also obvious that Eddie *836 has very serious academic problems, inasmuch as he should have been in the fourth grade at the time of trial, but he was performing at a first grade level at best.
It is apparent that the jury failed to consider the element of lost wages in their award of $100,000 to Eddie. The evidence clearly shows that as a result of this accident, he will be capable of earning a significantly lesser amount than he would have, and he should be compensated therefor. Based on the testimony of defendants' own expert, John Trapani, the lowest amount which the jury could reasonably have awarded as compensation for Eddie's loss of future earnings is $88,173.60.
Furthermore, in light of the child's extreme physical pain and suffering, the depression, mental and emotional problems resulting from the accident, including embarrassment because of the extensive scarring, the fact that he missed an entire year of school, and finally the fact of his disability from normal manual labor and athletic activities, the very lowest award for general damages within the discretion of this jury was $200,000.
We affirm the award of medical expenses in the amount of $58,000.

CONSTITUTIONAL ARGUMENT
We find the plaintiffs' final contention of error, that the plaintiffs were deprived of their constitutional rights to due process of law and equal protection of the laws, to be without merit. These issues were neither briefed, argued nor considered below, and therefore cannot be considered here. See State v. Madere, 352 So.2d 666 (La.1977); Johnson v. Welsh, 334 So.2d 395 (La.1976); Barron v. Allstate Insurance Company, 358 So.2d 663 (La.App. 1st Cir. 1978).

DEFENDANTS' CONTENTIONS OF ERROR
The first contention by the defendant is that the jury erred in its finding that William E. Ryals, Sr. and Betty Ann Ryals were not guilty of negligence.
We are well aware that, under Louisiana law, parents are required to properly supervise and protect their young children. Guidry v. Hamlin, 188 So. 662 (Orl.La.App. 1939); Pampas v. Cambridge Mutual Fire Insurance Company, 169 So.2d 200 (La.App. 4th Cir. 1964); Carter v. Salter, 351 So.2d 312 (La.App. 3rd Cir. 1977). However, all of the above cases cited to us by the defendant involved extremely young children, none of whom had even reached the age of three. Defendants argue that the reasoning in Carter, supra, wherein the court concluded that the child's mother was negligent in failing to take precautions against an unreasonable danger of which she had knowledge, should be applicable here.
We do not find the jury's verdict clearly wrong in holding the parents free of negligence. A parent's duty of supervision is measured by the standard of what a reasonable parent would do under the same or similar circumstances. The parents here admitted they knew of the existence of the well, but it is not unreasonable to accept their testimony that they did not know it was controlled by an automatic time clock, and thus were not aware of the full extent of the danger involved should their children go there to play. Furthermore, they testified that they had not known their children to play in that area.
Nor do we find manifest error in the conclusion that Eddie was not contributorily negligent. We do not feel that the danger involved in playing on the pumping jack when it was not in operation, considering the absence of a warning regarding the automatic character of its operation, was proven, under the facts and circumstances of this case, to be below the standard expected of someone of Eddie's age, intelligence and experience. The burden of proof of contributory negligence lies with the defendants. They failed to show that 8-year-old Eddie was indeed aware of the exact danger that the machine might be activated and he might get caught in it.

*837 DECREE
For the reasons assigned, the judgment appealed is amended to increase the award to William E. Ryals, Sr., as administrator of the estate of William E. Ryals, Jr., from the sum of $100,000 to the sum of $288,173.60. In all other respects, the judgment appealed is affirmed, costs of appeal to be borne by defendants-appellees.
AMENDED AND AFFIRMED.
FORET, J., concurs and will assign written reasons.
FORET, Judge, concurring.
I file this concurring opinion for the reason that the two expert witnesses (one for plaintiff and one for defendant) who testified as to this eight-year-old boy's future loss of earnings have left me far from convinced that their testimony is anything but rank speculation and conjecture. To illustrate the point, plaintiff's expert testified that the boy (who has an I.Q. of 85) would sustain over $200,000 loss of future earnings, while the defendant's expert testified that he would lose $88,000.
I concur in the decree, however, because I am of the opinion that the amount of $288,000 as general damages is fully justified.