520 So.2d 894 (1987)
Robert James BENNETT, Jr., Plaintiff-Appellee,
v.
SEDCO MARITIME, Defendant-Appellant.
No. 86-994.
Court of Appeal of Louisiana, Third Circuit.
November 4, 1987.
*896 Galloway, Johnson, Timothy Burr, New Orleans, and William Boone, Many, for defendant-appellant.
Richard Gallagher, Dallas, Tex., Burkett & Chevallier, Don Burkett, Many, for plaintiff-appellee.
Before DOMENGEAUX, DOUCET and LABORDE, JJ.
DOUCET, Judge.
Defendant, SEDCO Maritime (SEDCO), appeals from a judgment in favor of plaintiff, Robert J. Bennett, Jr., awarding him damages in the amount of $100,000.00 in lost future income for personal injuries sustained while working on one of SEDCO's offshore oil drilling rigs. Suit was brought under the Jones Act, 46 USCA § 688.

FACTS
Plaintiff testified that on January 21, 1983, while he was "tailing pipe"[1] on the SEDCO 702, a movable drilling rig then located off the coast of California, the section of pipe struck an apparatus on the rig floor causing it to swing back and strike him in the right knee. The apparatus or device was referred to as a "bird bath." He remained off of his leg for the rest of his shift, about six hours, then was treated by a medic who wrapped the knee with an Ace bandage and gave him two aspirins. The next day he performed more sedentary work and the following day he decided to see a physician onshore. A local orthopedic surgeon advised him that an operation *897 on his knee would be necessary and plaintiff decided to return to Louisiana for the operation.
In Shreveport, a Dr. Edwards performed arthroscopic surgery on plaintiff's right knee. He was off work for six months following surgery, during which time he received rehabilitative therapy. After returning to the 702, which was still off the California coast, and assuming duties as a derrick man, he strained his right knee. He remained off his knee for a couple of days before being checked out by a local orthopedic surgeon who sent him back to Shreveport. In Shreveport, Dr. William Bundick, an orthopedic surgeon, performed arthroscopic surgery on his knee. He returned to work several months later and was sent to a training school to qualify him as an assistant driller. He returned to work as an assistant driller on the 702 and helped drill three wells in the Gulf Mexico. In March of 1985, the 702 was taken to Ingalls Shipyard in Pascagoula, Mississippi where some structural modifications were to be made to the rig.
On his first shift of duty on the rig while it was in Pascagoula, plaintiff re-injured his right knee. He stepped through a hatch, right leg extended first, and slipped on some loose nuts and washers on the floor, causing him to hyperextend his right knee. Again he saw the medic on duty and, the next day, went to a local hospital emergency room where a brace was put on his leg, he was given crutches, and advised that he needed to see an orthopedic surgeon. He could not have seen a local orthopedic surgeon for three or four days so he returned to Shreveport. Dr. Carl Goodman, an orthopedic surgeon, performed arthroscopic surgery on his right knee and plaintiff has not returned to work for SEDCO since then.
Greg Nethery, a former employee of SEDCO, was working with the plaintiff on January 21, 1983. He testified that plaintiff was tailing a length of 3½ inch pipe when the end of the pipe struck the raised edge of a "bird bath" apparatus causing the pipe to vibrate out of plaintiff's hands and strike his right knee. Ricky Clark, also a former employee of SEDCO, was working with the plaintiff on April 11, 1985. He did not actually see the plaintiff slip on the nuts and washers but saw him immediately after the alleged accident when he came limping over clutching his knee in pain. He also stated that after the accident, he and another employee moved the nuts and washers off to the side so no one else would slip on them.
Mickey Mongold was employed by SEDCO at the time of trial as an assistant rig superintendent on the 702. He was working on the same crew as the plaintiff on January 21, 1983. He did not see the accident but looked over and saw the plaintiff holding on to his knee with one hand and steadying the pipe with the other. The witness described in detail the "bird bath" apparatus. It was constructed of 7½ ft. long sections of 5 inch drill pipe cut in half and welded to the rig floor. On top of these sections of pipe were welded 130 two-inch high pegs, approximately 6 inches apart. The "bird bath" had a border around it constructed of angle iron and also had a radiator device hooked up to it to radiate heat underneath to keep the drilling mud flowing in frigid weather conditions. This "bird bath", the witness stated, was designed to be used in the North Sea and was not functional at the time of the accident. Of the 15 to 20 offshore rigs Mongold had worked on, none of which were in the North Sea, not one had a "bird bath." James Bison was qualified by the court as an expert in offshore drilling practices and procedures, and, in particular, activities on the drilling floor. The witness had been on 20 to 30 offshore drilling rigs and had only seen one device similar to the "bird bath." The main hazard presented by the device, he opined, was its role as an obstacle to the worker who had to walk across it to get to the drilling hole. Plaintiff was attempting to do this when the pipe he was tailing struck the device. The witness felt that, working as plaintiff was, without an automatic pipe racker, holding the bottom of the pipe with his hands, it would be hazardous to have a "bird bath" on the floor.
*898 Medical testimony was presented by the video depositions of Dr. William Bundick and Dr. Carl Goodman. Dr. Edwards, who operated on plaintiff's knee following his first accident, was not heard from. Dr. Bundick first examined plaintiff on June 10, 1983 after he strained his knee. Plaintiff related to him his previous accident in January 1983, and subsequent surgery where Dr. Edwards removed some cartilage from his right knee. Dr. Bundick examined X-rays of the knee which revealed a roughening of the inside cartilage which he opined occurred at an earlier time when cartilage was removed from the knee. At the time he examined plaintiff, Dr. Bundick diagnosed plaintiff as suffering from a tear of the inside cartilage of the right knee or the "medial meniscus." He operated on the knee removing the torn cartilage, several loose pieces of cartilage, and smoothed out some rough cartilage on the end of the bone. The rough cartilage on the end of the bone was characterized as traumatic chondromalacia which the doctor believed developed slowly after the January 1983 injury. Dr. Bundick released plaintiff to return to work after examining him on August 5, 1983, at which time he had a full range of motion and excellent strength in the knee.
While on the witness stand, Dr. Bundick was advised of the April 1985 injury and was read an operative report detailing further surgery performed on plaintiff when more cartilage was removed from the knee. In view of all these surgeries, he felt that plaintiff's right knee was susceptible to reinjury because it does not have the normal amount of cartilage. The witness was familiar with the work performed by offshore rig workers and stated that he would be "somewhat hesitant" to return plaintiff to such work because such work would aggravate his knee. Dr. Bundick also believed that, based on the changes present in his knee, there was a very good likelihood that plaintiff would develop arthritis in his right knee in the future. On cross-examination the doctor felt that with restrictions on squatting and lifting heavy weights from a squatting position, plaintiff could work on offshore oil rigs.
Dr. Carl Goodman first examined plaintiff on April 22, 1985 after the accident in Pascagoula. He performed arthroscopic surgery and found some more tearing of the cartilage inside the knee as well as some fraying and roughness of the end of the femur. He removed the torn cartilage and shaved and cleaned up the area on the end of the femur. He also removed some "inflamed tissue" from the knee joint. Dr. Goodman stated that cartilage, once removed, is gone and will not be replaced through new growth. He further stated that although plaintiff would lose some stability in his knee, there would be no loss of strength per se. He agreed that the knee was permanently injured and that plaintiff will suffer some disability. He also felt it would be to plaintiff's medical detriment to return to work offshore and that because of his injuries and operations plaintiff would probably develop arthritis in the future. Medically speaking, Dr. Goodman stated that he had done all he could for plaintiff.
Dr. Richard Galloway, a certified vocational rehabilitation counselor, was accepted by both parties as an expert in the area of vocational and rehabilitation services. At the time he was interviewed by the witness, the plaintiff was 24 years old and related that he had worked in the oilfield since graduating from high school. At the time of the April 1985 accident, he was earning $13.02 per hour. Dr. Galloway stated that the U.S. Department of Labor regards employment as a roustabout, roughneck, derrickman, and driller to be heavy work. These are all jobs that the plaintiff had performed and he was an assistant driller at the time of his injury in April, 1985. He testified that such work requires the employee to lift objects weighing up to 100 pounds with frequent lifting and/or carrying of objects weighing 50 pounds. The employee must be able to climb, balance, stoop, kneel, crouch and crawl. This work is considered hazardous-type work activity.
Dr. Galloway found plaintiff to have an I.Q. of 98, placing him at the 45th percentileaverage intelligence. The results of a *899 standardized achievement test showed that plaintiff spelled and solved mathematics problems at the sixth grade level and read at the seventh grade level, the 19th, 27th, and 23rd percentiles, respectively. Based on this information, Dr. Galloway felt that plaintiff could be expected to pass most vocational school courses. An interest test showed that plaintiff did not enjoy sedentary-type work, preferring outdoor physical work. This presented a problem because of his knee condition which would preclude him from doing heavy, physical, outdoor work. The witness stated that without any vocational training plaintiff could expect to get a job paying only near-minimum wages. With vocational school training he could earn anywhere from $4.00 to $6.00 or $7.00 an hour to begin with. He did state that it was possible plaintiff could one day earn as much as he was making as an assistant driller, $13.02 per hour.
Dr. Randolph Price, a professor of economics at LSU, was accepted by the court as an expert in that field. His testimony concerned past lost income and future lost income. His computations were made considering plaintiff's working life expectancy, 33.94 years based upon U.S. Department of Labor statistics; his yearly income at the time of the April 1985 accident, $35,981.70, based upon an hourly wage of $13.02, twenty-one days of work followed by twenty-one days off with forty hours of regular pay and forty-four hours of time-and-a-half or overtime pay per seven days worked. The witness allowed for inflation and salary increases and determined the lump sum necessary to insure that plaintiff could draw $35,981.70 in present dollars per year for 33.94 years with the lump sum being exhausted after 33.94 years. The after tax amount was computed by Dr. Price to be $977,451.00. Assuming plaintiff could begin earning $6.00 per hour on the day of the trial, Dr. Price computed that he could earn $310,560.00 in 33.94 years. Subtracting that amount from $977,451.00, Dr. Price determined it would take a lump sum of $666,891.00 to supplement plaintiff's income to bring his overall yearly income to a present $35,981.70 for 33.94 years.
The witness also computed that from the date of his second injury, April 11, 1985, to the day of trial, plaintiff would have earned $20,629. From this figure he subtracted $2,150, the amount plaintiff earned through odd jobs during that period. The balance was $18,479.
The defense relied on alleged statements made by plaintiff that he had injured his knee in a rodeonot on the rig as he claimed. Mickey Mongold testified that the plaintiff once mentioned to him that he injured his knee bull riding. He did not see physical evidence of any such injury or know when it happened or know any other information about the alleged incident. He could not recall whether plaintiff mentioned the bull riding incident was before or after plaintiff's January 1983 accident. He could not explain why he failed to mention this information to either an investigator from SEDCO who interviewed him or to plaintiff's counsel during a deposition. He admitted that in the two days he and plaintiff had been on the rig before the January 1983 accident he had not noticed plaintiff limping or having any problems indicating his knee was injured.
Robert O'Neal, an assistant driller with SEDCO, worked with the plaintiff on the 702. He testified that the plaintiff told him that he first hurt his knee riding a bull in a rodeo. This conversation allegedly took place in September 1983, some eight months after the first accident. The witness did not come forward with this information until September 1985 when he learned plaintiff was suing SEDCO.
Darrell Florence, a welder with SEDCO, worked with plaintiff on the 702. In January 1983, he was on a flight to California to work on the 702 and noticed plaintiff limping down the aisle of the airplane. The witness asked him, "What's the matter with you [sic] knee?" He claimed the plaintiff replied that it "hurt bad" and that had he hurt it the previous weekend. Later, on the 702, the plaintiff allegedly displayed his knee to the witness who recalled that it was swollen to one and a half times its normal size. At that time the plaintiff supposedly told him he hurt it in a rodeo *900 when his leg hit a gate. Florence testified that the plaintiff told him he was going to say he hurt his knee on the job because he could not afford to pay the 20% deductible portion for medical treatment under his insurance policy. All of this allegedly occurred shortly before the January 1983 accident.
After the January 1983 accident, when plaintiff had assumed the duties of an assistant driller, he allegedly spoke of re-injuring his knee. Florence stated that on one occasion, plaintiff picked up a ball-peen hammer and struck his right knee with it. After striking his knee plaintiff showed Florence the scars from his surgery at which time the witness noticed his knee was swollen. Referring to a comment made by plaintiff on that occasion, Florence stated that he said "he had used a bigger hammer up on the drill floor as far as striking himself in the knee with it." In April 1985, shortly before the other accident, Florence stated that plaintiff mentioned that he was tired of working and "was fixing to think about re-injuring his knee and suing SEDCO for two million dollars, and sitting back like a fat dog." The witness saw him the following morning with an ice pack on his knee and the plaintiff allegedly said, "I told you so." Later, when he told Greg Nethery about plaintiff's actions and plans, Nethery said he knew of plaintiff's plans to sue because he had offered him $10,000 or a new car to testify for him. He stated that there were other employees present, at least five of whom he named, when Nethery allegedly mentioned the bribe. None of these witnesses were presented at trial. Florence also claimed to have told a SEDCO investigator about Nethery's statement long before this information was allegedly received by defendant's counsel. The witness did not tell plaintiff's counsel this information about Nethery although he was asked if he knew of any reason why Nethery would lie about what happened on January 21, 1983. Florence claimed that he misunderstood what counsel was asking. Florence stated that he had no animosity towards the plaintiff, was not promised anything for his testimony, and had nothing to gain from it.
Adrian Odom was a medic on the 702. In the early part of 1985, as he and the plaintiff were talking about his knee injuries, plaintiff placed his right foot on the witness's desk and showed him the scars on his leg. Plaintiff mentioned that he should just quit SEDCO, file a suit, and let SEDCO take care of him for the rest of his life. He said it wouldn't take much to make his leg swell up, and took his fist and struck his knee at least three times. With his leg outstretched, plaintiff also pressed down on his knee, hyperextending it. Odom admitted that it appeared to him that plaintiff felt his knee was severely damaged and he was always going to have problems with it. He also felt the plaintiff had not struck his knee hard and did not notice any impairment in the knee when plaintiff left the room. The witness remembered plaintiff injuring his knee on the rig in January 1983, and since then he had a significant amount of trouble with it. But he also recalled that the plaintiff had been "discontented with the rig for awhile" for reasons unrelated to his knee problems.
Rick Howerton was another medic on the 702. He examined plaintiff following the January 1983 accident. He first testified that he did not see any significant bruising or obvious discoloration of the knee but later stated that he noticed slight discoloration and swelling. He noted that plaintiff was dark olive-complected and bruising might not show up well. The witness recalled that after the 1983 accident, plaintiff was reluctant to go ashore. He wanted to stay and work, saying that he felt okay. Howerton testified that he saw nothing to indicate that the knee injury was a week or a month old. He too saw plaintiff on the 702 before the 1983 accident and did not notice him limping. Howerton also examined plaintiff following the April 1985 accident. He did recall Darrell Florence communicating his belief that plaintiff's knee injury wasn't on the "up and up."
Jeffrey Breal was an employee of SEDCO. His testimony was offered to impeach the credibility of Greg Nethery. Nethery *901 was apparently fired by SEDCO for drinking on the job. Nethery admitted he drank beer on one occasion but emphatically denied ever drinking whiskey. Breal testified that he saw Nethery pour and consume one drink of whiskey on the rig. Nethery admitted he had a bottle of that particular brand of whiskey, but denied ever opening the bottle or drinking any of the liquor.
Robert Catts was a close friend of the plaintiff. He had known him for about six years. Catts got the plaintiff involved in bull riding and they always went to rodeos together. Catts stated that he knew plaintiff never went to a rodeo without him because he kept plaintiff's rodeo equipment. He testified that the last rodeo he and plaintiff participated in was in November 1982. He was adamant in stating that plaintiff did not ride in any rodeos in December 1982 or January 1983, but admitted he did not see him from November 1982 until February 1983. He had possession of plaintiff's bull rigging equipment since November 1982plaintiff did not have it in December or January. He did not recall plaintiff ever injuring his knee in a rodeo and stated that he would have known it if he had.
Plaintiff testified that he did not ride in any rodeos in December 1982 or January 1983. He claimed he had not ridden in a rodeo since he and Robert Catts rode together in November 1982. He flatly denied ever injuring his knee in a rodeo event. He denied ever telling Darrell Florence that he had injured his knee in a rodeo. He denied encountering Florence in the shower with a swollen knee. He denied offering Greg Nethery $10,000 or a new car to testify on his behalf. He did remember speaking with Florence in April 1985 before his accident, while both were on the 702. Florence asked him how his knee was doing and plaintiff replied that it wasn't getting any better, but no worse. Plaintiff then asked Florence how his back was doing. (Florence had once injured his back working on the rig.) Florence stated that if he ever hurt his back again he would talk to a lawyer and plaintiff agreed, "Yeah, me too." Plaintiff further denied telling Florence he was going to claim he injured his knee on the 702 to avoid paying the deductible on his insurance or hitting his knee with a hammer. He also denied striking his knee in front of Adrian Odom or ever telling Mickey Mongold or Robert O'Neal that he injured his knee in a rodeo. Greg Nethery denied the allegation by Darrell Florence that plaintiff offered him a bribe.
Based upon the above evidence the jury found that SEDCO was negligent and such negligence was the legal cause of the injuries received by plaintiff on January 21, 1983 and April 11, 1985. The jury awarded no general damages, no damages for past lost income, and $100,000 total for future lost income. Defendant filed a motion for judgment notwithstanding the verdict and, in the alternative, a motion for a new trial; both motions were denied. On appeal defendant sets forth three assignments of error. Plaintiff also cites three assignments of error in his answer to defendant's appeal.
On November 12, 1985, prior to trial of this matter, defendant moved to transfer venue to a parish where counsel for plaintiff was not the District Attorney or his assistant, or, alternatively, to have plaintiff's counsel disqualified. The grounds set forth were that defendant's defense, fraud, would be prejudiced because of the jury's knowledge of plaintiff's counsel's position as District Attorney for Sabine Parish where the matter was to be tried. Defendant argued that a jury would be disinclined to accept a defense of fraud because of a conviction that the District Attorney would not represent a plaintiff who would perpetrate a fraud.

CHANGE OF VENUE
La.C.C.P. art. 122 provides for a change of proper venue and states:
"Any party by contradictory motion may obtain a change of venue upon proof that he cannot obtain a fair and impartial trial because of the undue influence of an adverse party, prejudice existing in the public mind, or some other sufficient cause. If the motion is granted, the action *902 shall be transferred to a parish wherein no party is domiciled."
The trial court declined to transfer the case or to disqualify plaintiff's counsel. Under La.C.C.P. art. 122 a change of venue is discretionary with the trial judge and his decision will not be disturbed absent a clear abuse of discretion. Savoie v. McCall's Boat Rentals, Inc., 491 So.2d 94 (La.App. 3rd Cir.1986), writ denied 494 So.2d 334, 494 So.2d 542 (La.1986); Deville v. Leonards, 457 So.2d 311 (La.App. 3rd Cir.1984).
A party seeking a change of proper venue has the burden of showing sufficient cause why he is unable to obtain an impartial trial in the court of original venue. A memorandum submitted by defendant simply recited a fear that the jury would not accept a defense of fraud because of a belief that "if the District Attorney of the Parish has concluded that there is no fraud, then there must be no fraud." We note that the affirmative defense of fraud was not formally raised until defendant amended its answer on the day of trial, January 7, 1986, almost two months after this motion was filed.
In denying defendant's motion the trial judge may have felt that any jurors predisposed to such impartiality could be ferreted out by counsel for defendant during voir dire examination. Yet during voir dire defendant's counsel questioned only six of the twelve jurors finally selected regarding any such impartiality. Defendant's assignment of error must, we feel, be premised on the argument that a juror could not believe that a District Attorney would knowingly represent a plaintiff who was attempting to perpetrate a fraud. This court hopes that every juror would harbor such a belief not only about a District Attorney but about any attorney. The six jurors questioned about counsel's position as District Attorney all stated in so many words that, in their eyes, he was just "another lawyer." We can only assume that had these jurors felt defendants established that plaintiff was attempting to perpetrate a fraud they would have believed plaintiff's counsel was unaware of the fraudulent nature of the claim and rejected that claim. In short, we are unable to say that defendant made such a showing of cause why it was unable to obtain an impartial trial in Sabine Parish that would render the trial judge's ruling an abuse of his discretion.

DISQUALIFICATION
The alternative motion by defendant was that plaintiff's counsel be disqualified from representing plaintiff because of a conflict of interest. Defendant argued that the District Attorney and his assistants owe a duty to the state as their client. Since one of the duties of that office involves prosecuting fraudulent claims, the defendant reasons that the representation of plaintiff created a conflict of interest.
La.Const. Art. 5 § 26(C) only prohibits a district attorney or his assistant from in any way defending or assisting in defending a client in any criminal prosecution or charge. Otherwise, the district attorney or his assistant may maintain a private law practice. It is against public policy however, for a prosecuting attorney to take a private position antagonistic to that of, or conflicting with, his public duty. 27 C.J.S. § 12(9). A public prosecutor allowed to engage in private practice has no discretion to choose between the public interest and the interest of a client; his private interest must yeld to the public one. 27 C.J.S. § 12(a).
Defendant cites as persuasive two opinions issued by the Committee of Professional Responsibility of the Louisiana Bar Association. In one, Opinion No. 214, the Committee concludes that the representation by a state Assistant Attorney General of clients charged with violations of traffic ordinances, while not a violation of ABA Canon 6 prohibiting the representation of clients with conflicting interests, should be discouraged and avoided. In the second, Opinion No. 331, the Committee concludes that a District Attorney or his assistant may not represent a wife in a divorce case and at the same time represent the state in a criminal charge against her husband. These cases involved persons actually charged with crimes or traffic violations.
*903 There is no specific criminal statute proscribing "fraud" of the type alleged by defendant. Although we are unable to find any cases where a "fraudulent" personal injury action has resulted in a criminal prosecution, such conduct would appear to come under the criminal statute proscribing theft, La.R.S. 14:67, which states in pertinent part:
"Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential." (Emphasis added)
The trial judge felt that defendant's allegation of fraud was an affirmative defense although not the "fraud" as contemplated by La.C.C.P. art. 1005. We feel the "fraud" as used in C.C.P. art. 1005 does encompass the conduct allegedly perpetrated by plaintiff. See Wallace v. Hanover Insurance Company of New York, 164 So.2d 111 (La.App. 1st Cir.1964) writ refused, 246 La. 598, 165 So.2d 486 (1964). Regardless, at the time defendant filed the motion to disqualify, it had not affirmatively set forth a defense of fraud. Of course, neither had any action been taken that would have resulted in plaintiff being charged with attempted theft by means of fraudulent conduct. Under these circumstances, and, considering that it is unlikely plaintiff would be charged with a criminal offense even if the jury had accepted the defense of fraud, we find no error in the trial court's denial of defendant's motion to disqualify plaintiff's counsel.

MOTION FOR A NEW TRIAL
Following the return of the jury verdict, defendant filed a timely motion for a judgment notwithstanding the verdict, or, alternatively, a motion for a new trial. Defendant alleged that a new trial was warranted because of improper behavior by the jury such that impartial justice was not done. The allegations were supposedly substantiated by the affidavit of the sole juror who declined to join the eleven other jurors who returned the verdict in favor of plaintiff. The trial court denied both motions. By his assignment of error defendant implies that the court erred in not considering the affidavit of Brenda Manasco in ruling on the motion for a new trial. The record does not reflect whether or not the trial judge did consider the affidavit. In any case defendant contends that when considered the affidavit establishes that impartial justice was not done and a new trial should have been ordered.
Defendant recognizes the well-settled rule which prohibits the admissibility of affidavits or other testimony of jurors to impeach their own verdict. See Lachney v. Jones, 373 So.2d 595 (La.App. 3rd Cir.1979) writ denied, 376 So.2d 959 (La.1979); Washington v. Lake City Beverage, Inc., 352 So.2d 717 (La.App. 3rd Cir.1977) writ denied, 354 So.2d 1050 (La.1978). The strong public policy reason behind the rule was restated by the court in Ryals v. Home Insurance Company, 410 So.2d 827 (La. App. 3rd Cir.1982) writ denied, 414 So.2d 375 (La.1982). Quoting from Renz v. Texas & Pacific Railway Company, 138 So.2d 114 (La.App. 3rd Cir.1962) the Court in Ryals stated:
"The rule is founded on public policy, and is for the purpose of preventing litigants or the public from invading the privacy of the jury room, either during the deliberations of the jury or afterwards. It is to prevent over-zealous litigants and a curious public from prying into deliberations which are intended to be, and should be, private, frank, and free discussions of the questions under consideration. Further, if after being discharged and mingling with the public, jurors are permitted to impeach verdicts which they have rendered, it would open the door for tampering with jurors and would place it in the power of a dissatisfied or corrupt juror to destroy a verdict to which he had deliberately given his assent under sanction of oath.
"Testimony of the jurors to impeach their own verdict is not excluded because it is irrelevant to the matter in issue, but *904 because experience has shown that it is more likely to prevent them to promote the discovery of the truth. Hence, the affidavit of a juror cannot be admitted to show anything relating to what passed in the jury room during the investigation of the cause, or the effect of a colloquy between the court and a juror, or the arguments made to a juror by a fellow juryman."
Defendant, however, distinguishes between impeaching the jury verdict and attempting to ascertain whether the jurors responded truthfully on voir dire. This court has in the past recognized such a distinction. A narrow exception has been carved out of the general rule which allows a court, when ruling on a motion for a new trial, to consider the affidavits and testimony of jurors concerning the truthfulness of their responses on voir dire examination. See Ryals, supra; Rains v. Diamond M. Company, 396 So.2d 306 (La.App. 3rd Cir. 1981), writ denied 399 So.2d 623 (La.1981), cert. denied, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982).
La.C.C.P. art. 1972 sets forth the circumstances in which a trial court shall grant a new trial and states in pertinent part:
"A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done."
The relevant portion of Brenda Manasco's affidavit stated:
"I kept saying that we did not feel he should get any money but, everyone kept discussing the fact that `if Bobby doesn't win, we will look bad in front of his family, and he is a home town boy, and we need to help our home town people'. It was also discussed the fact that Don Burkett, Robert James Bennett, Jr.'s attorney, was the District Attorney, and several of the jurors voiced opinion that `if we ever get into any trouble and we don't help Don out on this matter, he won't help us out when we get in trouble', and `that the boy must be hurt, because if Don Burkett had really thought that he got hurt at a Rodeo, he would not be trying to help him out in this case.'"
Defendant argues that this affidavit shows that the jurors did not respond truthfully during voir dire examination "when they stated under oath they would decide the case solely on the evidence and could ignore the position of plaintiff's counsel as District Attorney." Our review of this assignment of error is limited to determining whether the affidavit shows that jurors made untruthful statements on voir dire examination and whether that fact constituted improper behavior on the part of the jury so that impartial justice was not done.
While recognizing that a court may consider jurors' affidavits regarding untruthful statements on voir dire, the limited jurisprudence on this subject holds that the narrow exception should not be employed where the alleged untruthful statement was a general one that the juror could render an impartial verdict. Addressing this issue the court in Ryals, supra, stated:
"Were we to accept the plaintiffs' argument, any party who feels the jury verdict should have been different could raise the claim that the jury members were untruthful in stating that they could and would render an impartial judgment."
Thus the statement in Miss Manasco's affidavit referring to the plaintiff as a "home town boy" cannot be considered. Our inquiry will be limited to any untruthful statements on voir dire concerning the effect of plaintiff's counsel's position as District Attorneynot the general promise that all of the jurors made to render an impartial verdict based on the evidence.
Miss Manasco refers in a general way only to "several" jurors who made statements interpreted by defendant to be considerations of plaintiff's counsel's public position. During voir dire examination counsel for defendant, specifically questioned only six of the twelve jurors regarding whether their knowledge of plaintiff's counsel's position as District Attorney would affect their deliberations. All six *905 replied negatively and assured counsel that in their eyes plaintiff's counsel was "just another lawyer." Of the other six jurors, two responded they did not know any of the attorneys; one was not asked whether she knew any of the attorneys or plaintiff's counsel in particular; one responded that she knew three of the attorneys but was not asked any particular question regarding the District Attorney; one responded that she knew one of defendant's counsel; and finally, Miss Manasco stated that she knew the District Attorney but was not questioned as to whether this knowledge would affect her deliberation.
We presume that the voir dire examination was conducted, as it usually is, in open court with a large number of prospective jurors seated in the area reserved for spectators and called up to the jury box in groups of twelve for examination. We further presume that all of the prospective jurors knew that plaintiff's counsel was the District Attorney, if only from hearing that fact repeated over and over by counsel for defendant. Defendant's counsel clearly stated so much at one point during voir dire examination when, while questioning a prospective juror, he remarked that if the juror didn't know before that plaintiff's counsel was the District Attorney she surely knew now.
If the "several" jurors mentioned by Miss Manasco were those who made no promise that they would not consider counsel's position as District Attorney, then even had they considered this fact, it could not be said that they answered untruthfully on voir dire. Again, we may not consider promises made to be generally impartial. Miss Manasco does not name a single juror who allegedly made any of these statements.
We note that the verdict was eleven to one in favor of plaintiff. Even had Miss Manasco specifically named two jurors who were found to have made untruthful statements on voir dire, that would still leave nine jurors who presumably were fair and impartial. Since a verdict in a civil case only requires the concurrence of nine jurors we could not disturb that verdict. In resolving this assignment of error we give great weight to the public policy reasons militating against tampering with a jury verdict. We feel, as did the court in Ryals, supra, that this is an attempt by defendant to impeach the jury's verdict based upon the affidavit of the sole dissenting juror. Whether or not the trial court considered Miss Manasco's affidavit, we are unable to say that the court erred in denying defendant's motion for a new trial. The affidavit does not establish that any particular juror answered untruthfully on voir dire examination nor does the affidavit sufficiently demonstrate that impartial justice was not done.

SUFFICIENCY OF THE EVIDENCE
Defendant next contends that there was no reasonable evidentiary basis for the jury's conclusion that plaintiff suffered accidental injuries, that SEDCO was negligent, or that SEDCO's negligence was the legal cause of plaintiff's inquiries.
A seaman has a cause of action for personal injuries caused by the negligence of his employer under the Jones Act, 46 U.S. C.A. § 688. Plaintiff's status as a seaman within the meaning of the Jones Act was not an issue at trial and is not at issue on appeal. Defendant admits that plaintiff is such a seaman.
In reviewing this assignment of error we recognize that we are bound to employ a different standard of review in Jones Act cases than the usual manifestly erroneous standard. In Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), the U.S. Supreme Court commented on the applicable standard of review of cases tried under federal statutes such as the Jones Act. The court stated:
"It is no answer to say the jury's verdict involved speculation or conjecture * * * Only where there is a complete absence of probative facts to support the conclusion reached does a reversible error appear * * * the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary *906 inference or feel that another conclusion is more reasonable." (emphasis added).
See also Thezan v. Maritime Overseas Corp., 708 F.2d 175 (5th Cir.1983); Daigle v. Coastal Marine, Inc., 488 So.2d 679 (La. 1986).

A. INJURIES
We are unable to say there was a complete absence of probative facts to support the conclusion reached by the jury that plaintiff was injured while working on the 702 on January 21, 1983 and April 11, 1985. The jury obviously believed the testimony of the plaintiff and Greg Nethery concerning the circumstances of the January 1983 accident and the testimony of plaintiff concerning the circumstances of the second accident. A finding that plaintiff sustained injuries to his right knee is completely consistent with all of the medical testimony presented. It is also consistent with the testimony of Mickey Mongold who saw the plaintiff clutching his knee on January 21, 1983. It is consistent with the testimony of Rick Howerton who noticed, even on the dark, olive-skinned plaintiff, slight discoloration of the right knee as well as slight swelling after the 1983 accident. A finding that he was injured in 1985 is consistent with the testimony of Ricky Clark who saw plaintiff limping and complaining of pain immediately following the accident. Clark also observed and moved to the side the nuts and washers plaintiff apparently slipped on. It is obvious that the jury disbelieved testimony of Darrell Florence, who they may have felt harbored ill will towards the plaintiff. The jury apparently disbelieved or reconciled the testimony of Mickey Mongold and Robert O'Neal regarding alleged statements by plaintiff that he hurt his knee in a rodeo. There was no other evidence of any such rodeo incident or injury. Considering the evidence as a whole we are unable to find reversible error merely because another conclusion might have been as, or even more, reasonable as that reached by the trier of fact.

B. NEGLIGENCE
As plaintiff's employer under the Jones Act, SEDCO was under a duty to provide plaintiff with a reasonably safe place to work. Spinks v. Chevron Oil Company, 507 F.2d 216 (5th Cir.1975); Ellender v. Texaco, 425 So.2d 291 (La.App. 3rd Cir. 1982); Rains v. Diamond M. Co., 396 So. 2d 306 (La.App. 3rd Cir.1981). That duty is breached by even the slightest negligence on the part of an employer. Davis v. Hill Engineering, Inc., 549 F.2d 314 (5th Cir. 1977); Rains v. Diamond M. Co., supra.
The evidence before us furnishes ample basis for the jury's conclusion that SEDCO was negligent and that its negligence was the legal cause of plaintiff's injuries. The jury could have found that SEDCO was negligent in having the "bird bath" apparatus on the drilling floor of the 702. The evidence established that this device, designed to be used in the North Sea, was not operational at the time of plaintiff's accident and served as a hazardous obstacle to workers such as the plaintiff. None of the witnesses testified from personal knowledge that the 702 had ever been in the North Sea or had operated in frigid weather conditions. The evidence showed that prior to the 702 being used in California it was off the coast of Africa, in the southern hemisphere. For over two years after the January 1983 accident the 702 was either in California or the Gulf of Mexico. SEDCO chose to leave the nonfunctional "bird bath" attached to the drilling floor where it presented a safety hazard to its employees.
There was evidence that the April 1985 accident was caused by someone, presumably a SEDCO employee, leaving nuts and washers in an area where a passerby might slip on them. Although an expert witness testified that leaving nuts and washers on a walkway would be hazardous, that is an assumption which also may have been reasonably made by an ordinary juror.
In conclusion, given plaintiff's having sustained injuries to his right knee on January 21, 1983 and April 11, 1985, we are unable to say there is a complete absence of probative facts to support the jury's *907 conclusion that SEDCO was negligent and that its negligence was the legal cause of plaintiff's injuries.
Defendant cites what it characterizes as an inconsistent verdict by the jury. In answers to interrogatories, the jury found that SEDCO was negligent but that the 702 was not unseaworthy. We disagree. Different answers to negligence and unseaworthiness interrogatories in a Jones Act suit does not constitute an inconsistent verdict. The causes of action are separate. Brunner v. Maritime Overseas Corp., 779 F.2d 296 (5th Cir.1986), writ denied 476 U.S. 1115, 106 S.Ct. 1971, 90 L.Ed.2d 655 (1986).

PLAINTIFF'S ANSWER
In his answer to defendant's appeal plaintiff contends that the trial court erred when it decided to allow in evidence the testimony of two "surprise" witnesses, Darrell Florence and Robert O'Neal, and continue the trial to a later scheduled date. With the trial set for October 16, 1985, plaintiff's counsel claims that he only discovered the full import of the testimony of Florence and O'Neal on October 15th, when Florence was deposed. The names of Florence and O'Neal were given to plaintiff earlier but defendant failed to state completely the subject matter (fraud on the part of plaintiff) to which they were expected to testify. On the day of trial, October 16, 1985, a hearing was held on plaintiff's counsel's motion to exclude the testimony of O'Neal and Florence. It was argued that defendant's counsel violated La.C.C.P. art. 1428 requiring reasonable supplementation of responses to interrogatories. La. C.C.P. art. 1428 reads in pertinent part:
"A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to the identity and location of persons having knowledge of discoverable matters, and the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony."
The trial judge found that, at the very least defendant's counsel was negligent in failing to reasonably provide plaintiff's counsel with the subject matter of the witnesses' testimony. However, the trial judge ultimately determined that the ends of justice mandated a continuance as requested by defendant's counsel rather than exclusion of the testimony. The continuance would allow plaintiff's counsel to investigate and formulate a strategy to meet the allegations of fraud. Plaintiff's counsel was also awarded $1,000. Plaintiff contends this action by the trial court was error and that the trial court should have proceeded with the trial, and excluded the pertinent testimony of Florence and O'Neal.
A trial judge has great discretion in deciding whether to receive or refuse offered testimony of witnesses. Coignet v. Deubert, 413 So.2d 253 (La.App. 4th Cir.1982). "A continuance may be granted in any case if there is good ground therefor." La.C.C. P. art. 1601. A trial judge has great discretion in granting or denying a motion for a continuance and his decision will not be disturbed except in a case of clear abuse of discretion. Sather v. White, 388 So.2d 402 (La.App. 1st Cir.1980).
Plaintiff presents no evidence of prejudice suffered as a result of the trial court's action. Considering this fact and the great discretion afforded the trial judge in these matters, we are unable to find that the granting of a two-month continuance and the assessment of a fine in lieu of exclusion of the witnesses' testimony was error.
Plaintiff next contends the trial court erred in allowing defendant to amend its answer on the day of trial, January 7, 1986, to assert the affirmative defense of fraud. La.C.C.P. art. 1151 provides for amendment of an answer and reads in pertinent part:

*908 "A plaintiff may amend his petition without leave of court at any time before the answer thereto is served. He may be ordered to amend his petition under Articles 932 through 934. A defendant may amend his answer once without leave of court at any time within ten days after it has been served. Otherwise, the petition and answer may be amended only by leave of court or by written consent of the adverse party."
The decision to allow an amendment is within the sound discretion of the trial judge and his ruling should not be disturbed on appeal unless there has been an abuse of the broad discretion vested in him. White v. Cumis Insurance Society, 415 So.2d 574 (La.App. 3rd Cir.1982). The purpose of pleading an affirmative defense is to give fair and adequate notice of the nature of the defense so that the plaintiff is not surprised. Webster v. Rushing, 316 So.2d 111 (La.1975).
Plaintiff was aware of the details of the fraud defense since taking the deposition of Darrell Florence on October 15, 1985, almost three months before the court allowed the amendment of defendant's answer. He had ample opportunity to prepare to meet that defense and has made no showing of prejudice due the trial court's ruling. Accordingly, we find no abuse of the trial court's action in allowing defendant to amend his answer to set forth the affirmative defense of fraud.

DAMAGES
Plaintiff finally cites as error the action of the jury in awarding only $100,000 for his future lost income and its failure to award any damages for past lost income for the period between the April 1985 injury and the day of trial. Plaintiff does not cite as error the jury's failure to award general damages for pain and suffering.
Jury awards under the Jones Act may not be disturbed on appellate review unless the court finds there is no law and evidence to sustain them. Ellender v. Texaco, Inc., supra; Rains v. Diamond M. Co., supra.
The jury apparently accepted the medical testimony that a return to work in the oil field would be physically detrimental to the plaintiff because of his knee injuries and surgeries. The testimony of the vocational rehabilitation expert confirms this prognosis. The only testimony presented regarding lost earnings was that of Mr. Rice, the economics professor. Dr. Rice testified that from April 11, 1985, the day of the last accident, to the day of trial, plaintiff lost $18,479.00 in earnings by not working at his job with SEDCO. He further estimated that plaintiff's future lost income for 33.94 years, based upon plaintiff's employment at $6.00 per hour, would be $666,891.00. However, Dr. Rice admitted that it was foreseeable that after vocational training and years of experience plaintiff might earn $13.01 per hour, the hourly wage he was earning prior to his injury.
The jury awarded plaintiff $40,000 for future lost income attributable to the 1983 accident and $60,000 for future lost income attributable to the 1985 accident. We are unable to find that there is no law and evidence to sustain the jury's award for future lost income. The jury may have felt that with vocational training and some experience plaintiff could be earning close to what he had been earning at SEDCO. Such a finding would have been supported by the testimony of Dr. Rice. However, we feel that, considering the law and evidence, the jury erred by not awarding plaintiff any sum for past lost income. We will amend the judgment to award plaintiff damages for past lost income in the amount of $18,479.00.
For the reasons assigned, we amend the judgment of the trial court to increase the award to $118,479.00. We affirm the judgment in all other respects.
AMENDED; AFFIRMED AS AMENDED.
NOTES
[1] When "tailing pipe" the worker holds the bottom of a long section of drilling pipe as it is transferred from a rack to be used in drilling.