# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 05-174


SHAUNN CAILLIER MCCORVEY

VERSUS

DERRIEL CARLTON MCCORVEY


**********


APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 02-C-2619-A
HONORABLE AARON FRANK MCGEE, DISTRICT JUDGE


**********


## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE


**********


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.


                                                         **AFFIRMED.**


**Alex L. Andrus, III**
**ANDRUS & DOHERTY**
**117 North Market Street**
**Opelousas, LA 70571**
**Telephone: (337) 942-5645**
**COUNSEL FOR:**
    **Plaintiff/Appellee - Shaunn Caillier McCorvey**


**Glenn James Labbe**
**P. O. Box 90870**
**Lafayette, LA 70509**
**Telephone: (337) 233-3033**
**COUNSEL FOR:**
    **Defendant/Appellant - Derriel Carlton McCorvey**

**Derriel Carlton McCorvey**
**The Law Office of Derriel C. McCorvey, L.L.C.**
**P. O. Box 2473**
**Lafayette, LA 70502**
**Telephone: (337) 291-2431**

THIBODEAUX, Chief Judge.

In this child custody case, the Defendant, Derriel McCorvey, appeals from a judgment of the trial court which denied his Motion for Change of Venue, denied his Motion to Strike and for Sanctions, denied his Motion to Expand Parental Custody, and which granted the Plaintiff's Motion and Order for Contempt and to Restrict Inappropriate Activities in the Presence of the Minor Child and to Restrict Visitation. For the reasons set forth below, we affirm the well-reasoned judgment of the trial court.

I.

**ISSUES**

The issues to be determined are:

1) whether the trial court abused its discretion in denying Defendant's Motion for Change of Venue;

2) whether the trial court abused its discretion in finding Defendant in contempt of court;

3) whether the trial court abused its discretion in denying Defendant's Motion to Strike Language from Plaintiff's Motion; and,

4) whether the trial court abused its discretion in restricting Defendant's visitation and in denying Defendant's Motion to Expand Parental Custody.

II.

**FACTS**

Plaintiff, Shaunn Caillier-McCorvey, filed a Petition for Divorce and Incidental Relief in St. Landry Parish against Defendant, Derriel McCorvey, on grounds of adultery on June 24, 2002, one year after the birth of their daughter, Darian Z. McCorvey, born on June 25, 2001. Plaintiff asked for sole custody of the

1

minor child and, in the alternative, joint custody, use of the family home in Opelousas, and a judicial partition of community property in due course. The judgment of divorce was rendered on November 12, 2002. Joint custody was awarded to both parties with domiciliary custody awarded to the mother, Shaunn Caillier-McCorvey.

Both parties are practicing attorneys, and the record contains four volumes of documents, five bound volumes of exhibits including the records of two previous appeals, as well as large envelopes of exhibits, indicating a contentious divorce, and property and custody battles between the parties. At some time during these proceedings, Defendant Derriel McCorvey married Kia Harden, and Plaintiff Shaunn Caillier-McCorvey married Kia Harden's former spouse, Michael Harden.[1] The Hardens had three children, who became the step-children of both parties herein. The three Harden children are primarily domiciled with their mother and the Defendant, wherein Kia Harden McCorvey is their domiciliary parent.

On June 3, 2003, having already issued verbal orders in chambers regarding racial slurs in the presence of the child, Judge James T. Genovese rendered a written Judgment on Child Custody/Visitation ordering the parties to avoid racial comments or slurs regarding the child or the child's effects.

On February 23, 2004, Judge Genovese issued an order finding Defendant in contempt for willful disobedience of a preliminary injunction regarding distribution of community funds. He was sentenced to pay a fine and serve fifteen days in the St. Landry Parish jail (suspended under one-year probation).

On May 3, 2004, Ms. McCorvey filed a Motion for Contempt, to Restrict Inappropriate Activities in the Presence of the Minor Child and to Restrict Visitation.

---

[1]For ease of identification, Ms. Harden, the Plaintiff, will be referred to in this opinion as "Ms. McCorvey," her surname which appears in the caption of the record.

Her contempt motion was based upon Mr. McCorvey's alleged violation of the above-referenced June 3, 2003 written order of Judge Genovese, as well as his previous verbal orders in chambers, to avoid racial, ethnic, or prejudicial comments or slurs. Plaintiff also sought a judgment ordering Defendant to refrain from intentionally and willfully exposing the minor child to music which contains sexually explicit lyrics and to restrict the Defendant's visitation with the minor child. Judge Aaron Frank McGee granted Plaintiff's Motion for Contempt but deferred penalties and reduced Defendant's visitation in a judgment dated September 9, 2004.

On May 20, 2004, Defendant filed a Motion and Order to Decrease Child Support[2] and to Expand Parental Custody. He also filed a Motion and Order to Strike and for Sanctions against Plaintiff and her attorney, arguing that they had included scandalous, indecent, and profane language in the pleadings and had attached "naked" photographs as exhibits. Judge McGee denied Defendant's Motions and restricted rather than expanded visitation, pursuant to his September 9, 2004 judgment.

After the recusal of two trial court judges, and an attempt to recuse a third, Mr. McCorvey filed a Motion for Change of Venue. Judge McGee heard the Motion for Change of Venue along with the above motions in June 2004, denying the venue motion from the bench. Judge McGee did not include the venue ruling in his written judgment of September 9, 2004, but the venue motion is deemed denied and addressed herein.[3] It is from the above rulings of Judge McGee that this appeal is brought by Defendant, Derriel McCorvey.

III.

---

[2]The issue of reduction in child support is not on appeal herein.

[3] *See Mabry v. Mabry,* 522 So.2d 699 (La.App. 5 Cir. 1988) (judge ruled from bench denying alimony, but written judgment was silent as to claim; claim for alimony was deemed denied and, accordingly, was addressed by court of appeal).

# LAW AND DISCUSSION

## *Standard of Review*

An appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A two tiered test must be applied in order to reverse the findings of the trial court:

> 1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
>
> 2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

*Mart v. Hill*, 505 So.2d 1120 (La.1987).

Even where the appellate court believes its inferences are more reasonable than the fact finder's, reasonable determinations and inferences of fact should not be disturbed on appeal. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). Additionally, a reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record and evidence, an appellate court may not reverse said findings even if it is convinced that had it been sitting as trier of fact it would have weighed that evidence differently. *Housely v. Cerise*, 579 So.2d 973 (La.1991). The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts.

### *Change of Venue*

Mr. McCorvey, an attorney representing himself on this issue, contends that the trial court erred in denying his Motion for Change of Venue under La.Code Civ.P. art. 122, which provides as follows:

> Art. 122. Change of proper venue
>
> Any party by contradictory motion may obtain a change of venue upon proof that he cannot obtain a fair and impartial trial because of the undue influence of an adverse party, prejudice existing in the public mind, or some other sufficient cause. If the motion is granted, the action shall be transferred to a parish wherein no party is domiciled.

Mr. McCorvey argues that his former wife, the Plaintiff herein, Ms. McCorvey, now Harden, is an attorney in St. Landry Parish and that this fact will prevent him from obtaining a fair result in that parish. However, he fails to offer evidence of any unfair dealings as a result of her employment. Instead, Mr. McCorvey complains that two of the four judges of the Twenty-Seventh Judicial District Court and one hearing officer have been removed from hearing matters in this proceeding due to conflicts or potential conflicts with witnesses, parties, or attorneys in the case. As support for his argument that he is being denied impartial proceedings, he offers details of the various recusals of the judges and hearing officer.

More specifically, Judge Alonzo Harris recused himself on July 3, 2002 because he had consulted with the parties on their prenuptial agreement and was expected to be called to testify regarding same. Judge James T. Genovese recused himself to avoid the appearance of impropriety because his campaign manager had performed some work for Ms. McCorvey. Mr. McCorvey sought removal of Hearing Officer Otis Lomenick due to a remark allegedly made by Mr. Lomenick during an unrelated conference and subsequently reported to Defendant. The alleged remark was, "I just can't stand him." While the hearing officer was not officially or formally

recused, it was determined that all proceedings in this matter would by-pass him.[4] Accordingly, rather than providing evidentiary support for a change of venue, the recusals tend to support a position that any potential bias has indeed been removed, and further indicate that everything is being done to ensure that Mr. McCorvey receives fair and impartial proceedings in his case.

Ms. McCorvey argues that the assignment of error on venue should be deemed abandoned where Defendant failed to brief the issue pursuant to Uniform Rules, Court of Appeal Rule 2-12-4. This rule provides in pertinent part that Defendant's brief must contain an argument confined strictly to the issues of the case, free from unnecessary repetition, giving accurate citations of the pages of the record and the authorities cited. Also, the argument must include a suitable reference by volume and page to the place in the record which contains the basis for the alleged error. Otherwise, the court may consider as abandoned any specification or assignment of error which has not been briefed. *See Hansel v. Holyfield,* 00-62 (La.App. 4 Cir. 12/27/00), 779 So.2d 939, *writs denied,* 01-276, 01-279 (La. 4/12/01), 789 So.2d 591.

In the present case, the argument of Mr. McCorvey on the issue of change of venue is deficient. He did not state which other venue he wishes to access in his appellate brief, or in his oral argument, or in his original Motion for Change of Venue. The motion consists of one page and one paragraph of argument, contains only one clear reference to the record, and that reference cites to the order of recusal, rather than to any facts upon which the change of venue could be based. Likewise, Mr. McCorvey's brief on appeal relies almost exclusively on the recusals and cites no case law in support of the change of venue.

---

[4]Defendant also attempted to recuse Judge Aaron Frank McGee. Defendant's motion was heard by Judge Donald W. Hebert on May 20, 2004, and subsequently denied. That ruling is not being appealed herein.

While we find Mr. McCorvey's arguments sorely lacking, he did cite a basis in law for a change of venue, La.Code Civ.P. art. 122. Accordingly, under the present circumstances, where we have other more compelling grounds to deny the venue change, we will not base our decision on a failure to brief under the Uniform Rules, Court of Appeal Rule 2-12-4. We now turn to the issue of evidentiary support.

Ms. McCorvey argues that Mr. McCorvey failed to support his argument for change of venue with evidence of any kind. At the hearing on his Motion for Change of Venue, Mr. McCorvey presented nothing more than a brief oral argument before the trial judge. Ms. McCorvey's counsel then asked for a dismissal, stating that Mr. McCorvey had not called witnesses or adduced proof of any kind to support his claim and, therefore, failed to carry his burden under Article 122, which requires "proof that he cannot obtain a fair and impartial trial." Ultimately, the trial court agreed. Ms. McCorvey cites *Deville v. Leonards*, 457 So.2d 311 (La.App. 3 Cir. 1984). There, this court held:

> Under La.C.C.P. Art. 122, a change of venue is discretionary with the trial judge and will not be disturbed absent a clear abuse of discretion. Pursuant to this article, the mover has the burden of showing sufficient cause why he is unable to obtain an impartial trial in the court of original venue. Plaintiff's unsupported allegation that he is disliked in Acadia Parish is insufficient to meet that burden. Nor does the fact that ten attorneys refused to take his case suggest that he is disliked or unable to obtain a fair and impartial trial. We find no abuse of the trial judge's discretion in denying plaintiff's motion for change of venue.

*Id*. at 312.

Similarly, in the present case, Mr. McCorvey has made unsupported allegations that he is disliked and that his wife's position as an attorney will result in unfair proceedings in an effort to show abuse of discretion on the part of the trial

7

court. He has not presented deposition testimony, affidavits, or any form of evidence or jurisprudence in support of his motion for a change of venue.

In *Bennett v. Sedco Maritime*, 520 So.2d 894 (La.App. 3 Cir. 1987), a drilling rig owner in a Jones Act suit argued that because the plaintiff's counsel was the district attorney in the parish where the matter was to be tried, the rig owner would not receive an impartial trial there. However, jurors questioned about the counsel's position as district attorney all stated in so many words that, in their eyes, he was just "another lawyer." Accordingly, this court held that the rig owner was not entitled to a change of venue under Article 122.

Similarly, in the present case, where the Plaintiff, Ms. McCorvey, is an assistant district attorney, and where the case is a judge-tried case, the trial judge stated the following:

> **THE COURT:** I do not disagree with the technicalities you are raising, Mr. Andrus, okay. Proof requires Proof. I will say this however, now addressing Mr. McCorvey . . . if your argument were testimony, I would still deny the change of venue, the reasoning being that the Court does not find that there is the possibility of undue influence. . . . First of all, it's not a jury trial, it's a bench trial. Secondly, if all four Judges of the 27th Judicial District Court had recused themselves, it still does not mean there would have been a change of venue. I think Mr. Andrus is correct in that . . . and pursuant to directions from the Supreme Court, what we do in those situations is we ask the Supreme Court to appoint another Judge to hear the case. . . . but some of your argument, in terms of undue influence, also falls kind of under the recusal motions, which we've already dealt with. You are correct in that Judge Harris recused himself, Judge Genovese recused himself. I did not recuse myself. There was a hearing. Judge Hebert concluded that it was appropriate for me to continue with the case and I'm doing that. . . . one of the reasons that I did not recuse myself was that I do not feel the influence that concerns you, as the moving party on venue. And I'm stating all these things because I want the record to reflect what's going through my mind as I address this issue. The 27th Judicial District Court, unlike most of the districts, is divided into four judicial districts. . . . We think in terms of Divisions A, B, C, and D. I am

the election district for Division B, which is election district number . . . four, I believe. . . . The bottom line is that I certainly am aware of the fact that Larry Caillier is the Chief of Police for the City of Opelousas. The City of Opelousas does not vote in the election district for Division B, so Chief Caillier never has had and never will have, unless the legislature changes the law, any influence in the election of the Division B Judge. Additionally, when I ran, I ran without opposition . . . so I never had any occasion to even go ask the Chief for any help. . . . I've already announced that I'm stepping down in February of next year. . . . So, my point is that the concern of undue influence by Chief Caillier is simply not there. As relates to the fact that Mrs. Harden, the former Mrs. McCorvey, is with the District Attorney's Office, I am also the same Judge that handled the divorce litigation . . . involving the senior member of the District Attorney's Staff. . . . I would handle the domestic of the District Attorney, if that's what it took. I do not duck things just because they involve people that are attorneys, or public officials . . . . I'll do what I have to do. I do not feel as though there's any concerns, any undue influence. If there would have been, I would have stepped down a long time ago. . . . So I say those things . . . so there's a complete record made in terms of why we're proceeding and why I'm denying the Motion for the change of Venue. . . .

In addition to the trial court's specific remarks regarding his impartiality, this court notes the well-settled presumption that judges are deemed to be impartial absent proof to the contrary. *State v. Edwards*, 420 So.2d 663 (La.1982).

In *Faulk v. Schlumberger Well Services*, 412 So.2d 162 (La.App. 3 Cir. 1982), an automobile accident suit filed in Cameron Parish, we affirmed the trial court in denying a change of venue under La.Code Civ.P. art. 122. There, the defendant argued that an indictment for negligent homicide had been sought against him in that parish and that the deceased motorist was a police jury member whose widow had campaigned extensively for election to his vacant seat, resulting in further publicity being given to the death. We found that there had been no showing of "any undue influence in favor of plaintiffs or that defendants were prejudiced or that they did not receive a fair trial." *Faulk*, 412 So.2d at 165. We further stated, in view of

the judge's rulings during voir dire and his removal of some jurors on his own motion, "we hardly see how the trial court could have been more fair." *Id.*

Again, in *Savoie v. McCall's Boat Rentals, Inc.*, 491 So.2d 94 (La.App. 3 Cir.), *writs denied*, 494 So.2d 334, 494 So.2d 542 (La.1986), we carefully reviewed the record and affirmed the trial judge in denying a motion for change of venue under Article 122. There, we stated:

> Though the defendant maintains that an "intolerable condition" existed because the plaintiff was the son of the Sheriff, it failed to show any undue influence in favor of the plaintiff by which it was unduly prejudiced or denied a fair and impartial trial. In fact, in its brief, the defendant admits that it "does not imply that Sheriff Savoie committed any improper act to exercise an undue influence over the jurors." . . .
>
> The defendant has also made no showing that there was any undue influence or prejudice that operated to his detriment simply because the jury venire was composed of two former clients of the plaintiff's counsel.

*Savoie,* 491 So.2d at 100.

Similarly, in the present case, Mr. McCorvey himself made statements that undermine his attempts to obtain a change of venue under Article 122. More specifically, where he asserted undue influence as a result of his ex-wife's father's position as Chief of Police of Opelousas, Mr. McCorvey argued, "I think his reputation precedes itself, widely known, you know a mired [sic], grudges held against." Accordingly, the reference to grudges held against Chief Caillier operates to illuminate the fact, as some cases have referenced, that public opinion regarding a public official can be a double-edged sword. The same theory applies to assistant district attorneys. That is why voir dire is available in jury trials.

Although Defendant argues at times as if this were a jury trial, the presiding judge made it very clear, in very specific statements, not only *that* there was no undue influence, but *why* there was no undue influence in this case. Based upon

10

the foregoing, we agree that Mr. McCorvey has failed to meet his burden of showing prejudice and undue influence under La.Code Civ.P. art. 122.

Moreover, Ms. McCorvey further argued that venue for these proceedings (divorce and ancillary issues) is jurisdictional and not subject to transfer, and that even if an agreement were reached to try the case elsewhere, they could not do that because the proceedings are jurisdictional.

We note that these proceedings were filed in the proper venue in St. Landry Parish, where the parties were domiciled in a home they owned, constituting immovable community property. The articles governing divorce and community property issues, La.Code Civ.P. art. 3941 and La.Code Civ.P. art. 82, respectively, establish mandatory venue, and child custody article, La.Code Civ.P. art. 74.2, provides for permissive supplementary venue, all of which prime the general rules of venue.[5] These family law causes of action generally require venue in the domicile of one of the parties or in the last matrimonial domicile which, in this case, conflicts with the Article 122 transfer to a parish where no party resides. We have found no law addressing this conflict. In fact, there are very few cases interpreting Article 122, even though it originated over forty years ago. In particular, we have located no cases transferring venue under Article 122 that involve the family law issues of custody, visitation, community property, and child support.

In some future case, where family law issues are litigated, and where undue influence under Article 122 is supported in the record, and where no venue is available to satisfy the requirements of all statutes involved, we will be obliged to

---

[5]La.Code Civ.P. art. 43: "The general rules of venue provided in Article 42 are subject to the exceptions provided in Articles 71 through 85 and otherwise provided by law." *See also*, *Kellis v. Farber*, 523 So.2d 843, 845 (La.1988): "The Code of Civil Procedure provides a general rule of venue followed by various permissive and mandatory supplementary provisions. The general rules of venue are contained in article 42, the permissive supplementary rules in articles 71 through 77, and the mandatory supplementary rules in articles 78 through 85. Several other mandatory venue rules are provided for in other parts of the Code."

resolve the conflict. However, in the present case, because we find that Defendant failed to prove bias or undue influence or any entitlement to a transfer of venue under La.Code Civ.P. art. 122, we find it unnecessary to address the jurisdictional venue of the family law articles. Accordingly, we affirm the trial court in denying Mr. McCorvey's Motion for Change of Venue.

### *Finding of Contempt*

The judgment of the trial court states in pertinent part, "Derriel McCorvey is found guilty of contempt of Court for violation of the verbal Order and written Order of Judge James T. Genovese signed June 3, 2004 [sic][2003]." Judge Genovese's June 3, 2003 written order stated that, "Neither parent shall make any racial, ethnic, or prejudicial comments or slurs regarding the child, or the child's effects in the presence of the child." Judge Genovese had previously in chambers verbally ordered the parties not to make racial or ethnic slurs in the presence of the minor child.

These orders were the result of the mother's concerns and the belief of Judge Genovese that it was in the best interest of the child to be reared in an atmosphere of respect for all cultures and of tolerance for diversity, where that is the reality of our American society into which she is growing. Because of the offensive language about to be described, it should be noted at this juncture that the parties involved are of the same race. The following events led to the ruling on visitation.

On March 17, 2004, the Defendant went to the home of his former mother-in-law to pick up Darian for the weekend visitation. Darian was a little over two and a half years old at the time and was clutching one of her favorite dolls from a Disney animation. The record indicates that the doll was a Caucasian, "Barbie-" sized doll, representing Beauty from the "Beauty and the Beast" animation. Mr.

McCorvey had previously asked Ms. McCorvey why Darian had this "big ole white doll." At the time of this exchange, Mr. McCorvey took the doll away from his little girl and discarded it under the carport. The grandmother came out of the house with Darian's overnight bags, saw the child in distress, saw and retrieved the doll, and asked whether Darian intended to take the doll with her. Darian said yes, but Mr. McCorvey objected, saying that she could not have "those kinds of dolls" at his house. The child began crying and reaching for her doll,[6] and the custody exchange was made very difficult.

On March 25, 2004, Mr. McCorvey again went to pick up Darian for visitation. Darian had various toys of her choosing for the weekend. This time, Mr. McCorvey objected to a miniature playhouse that depicted white children inside. Over the child's protests and the mother's efforts to make the transition easier for Darian by giving the toy back to her and then asking Mr. McCorvey's wife to take it in the car, Mr. McCorvey repeatedly took the toy, even from his wife, and made a show of discarding it under the carport. Subsequently, at this same exchange, Mr. McCorvey cursed Darian's new stepfather, Michael Harden, calling him a "bitch-ass nigger" and a "pussy ass nigger" and threatening him with an "ass whipping." All of this occurred in the presence of Darian and Michael Harden's three children who were in Mr. McCorvey's car with their mother, Kia Harden McCorvey. These events were witnessed and testified to by Plaintiff, her husband, the maternal grandmother, the housekeeper, and the housekeeper's daughter.

---

[6]The court notes that the photographs submitted by Ms. McCorvey as exhibits in this matter depict the little girl's room with a large majority of African-American dolls, including "baby" dolls and "Barbie" dolls, and a few "white" dolls, indicating that the child is living in an environment with her mother that celebrates her own culture without prohibiting the diversity that Judge Genovese sought to instill in the best interest of the child in today's society.

Mr. McCorvey argued that Judge Genovese's order requires that he not make racial slurs *regarding the child or the child's effects*, and that he did not use racial slurs when referring to the child or her effects. However, the record indicates that the verbal orders of Judge Genovese had previously prohibited the language used and the events that occurred while *in the presence of the child*. Judge Genovese was called as a witness and was asked to read the written order into the record, and to clarify the broader verbal order that he gave the parties. Pursuant to questions by Plaintiff's attorney, Alex Andrus, Judge Genovese testified as follows:

> Q.   Your Honor, in addition to that [written order], do you recall having a conference in chambers with the parties, including Derriel McCorvey . . . regarding an admonishment not to make *any racial slurs in the presence of the child*?
>
> A.   I did have an extensive pre-trial, preliminary conference, on those issues in chambers with both Ms. McCorvey and Mr. McCorvey.
>
> Q.   And Your Honor, had there been evidence regarding allegations of racial remarks being made by the parents in this case?
>
> A.   Previous thereto, there was testimony elicited . . . . and there were complaints made by Ms. McCorvey that there were certain statements made . . . position taken regarding racial and ethnic matters with the child of tender age. . . . There were allegations that the child was being restricted in the manner in which the child was being raised . . . contrary to racial equality, which was of concern to me . . . . some reference to dolls . . . Some concerns by the mother that the daughter had to be raised in a certain environment, and that the African-American influence would have to be maintained and preserved always, at all times, and that the child was not to be exposed to any diversity whatsoever. . . . I wanted to make sure that the child had full exposure to all cultures, all races . . . . That was a deep concern of mine. . . .
>
> Q.   And did you admonish the parties not to make any racial slurs or ethnic slurs in the presence of the child?

14

A.    Absolutely.  I never condone, at any time, any type of activity like that.  It's probably more than an admonition, Mr. Andrus.  I take that . . . very seriously, especially [in] a custody matter. . . .  I wanted the child to have a good, wholesome upbringing so that the child would be exposed to society as society is, not in some tunnel vision type approach. . . .

Q.    Your Honor, was that order communicated directly to both parties?

A.    Well, I told them that in my chambers.  Point blank.

Judge Genovese was then asked to read silently the offensive racial language used by Defendant against the child's stepfather in the presence of the child, and to state whether he would consider that language to be within the ambit of his order prohibiting racial slurs.  Judge Genovese responded, "Yes . . . . that type of language would constitute a racial slur, and would constitute a very demeaning, debasing statement that would be very detrimental to the upbringing of this child, and . . . this type of activity would not be allowed in the presence of the child."  He further testified that the language complained of was exactly what he intended to prohibit, "any type of racial slurs, any type of activity that would be a violation of ethnicity" because such activity would be detrimental to the best interest of the child.

A contempt of court is any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority.  La.Code Civ.P. art 221.  A direct contempt of court is one committed in the immediate view and presence of the court.  La.Code Civ.P. art. 222.  A constructive contempt of court includes an act of "[w]ilful disobedience of any lawful judgment, order, mandate, writ, or process of the court. . . ."  La.Code Civ.P. art. 2242.  Based upon the orders of Judge Genovese in 2003, the events in March of 2004, and the evidence adduced, Judge McGee did not err in finding Mr. McCorvey in contempt.  Mr. McCorvey argues that he and his current wife testified

15

that those events did not occur but that Judge McGee chose to believe Plaintiff and her four witnesses instead. However, it is well settled that the trial court is in the better position to evaluate the testimony before him.

### *Failure to Strike Objectionable Language and Photographs*

Mr. McCorvey filed a Motion and Order to Strike and for Sanctions against Ms. McCorvey and her attorney, stating that in Ms. McCorvey's Motion for Contempt they had included scandalous, indecent, and profane language. The language at issue is the above-referenced racial slurs and threats made by Mr. McCorvey toward Darian's stepfather, Michael Harden. Ms. McCorvey testified regarding the lengthy consideration she gave to the drafting of the Motion for Contempt and the inclusion of the foul language used in the presence of Darian and the children of Michael Harden. Ms. McCorvey testified that she consulted other attorneys about the propriety of including the quoted language and determined that the language was relevant, germane, and necessary to demonstrate to the court Mr. McCorvey's violation of the direct orders of Judge Genovese.

While Mr. McCorvey accuses Ms. McCorvey and her attorney of character assassination, Ms. McCorvey argues that the language used does not describe her ex-husband; rather, it recites verbatim what Ms. McCorvey and four witnesses heard Mr. McCorvey say in the presence of Darian and the Harden children. Moreover, Ms. McCorvey testified that under Louisiana's fact pleading procedure, the inclusion of the language was appropriate. In his reasons for judgment, Judge McGee stated:

> The Court is satisfied that the language of petitioners pleadings, while being somewhat "graphic", are not inappropriate and is not unlike the testimony the Court receives from witnesses during a trial when the witness is hesitant to use the actual language spoken, in relating what the witness might have heard someone say, such as the "F

16

word", the "N word", "S O B", etc. The Court is of the opinion that the evidence received by the Court substantiates the allegations and that the allegations may well have been subject to objections had not the specifics been alleged.

Mr. McCorvey further argues that Judge McGee erred in failing to strike the scandalous, indecent, "naked photographs" from the CD jacket insert of the group "Outkast" which Ms. McCorvey attached as an exhibit to her trial court brief without alleging that Mr. McCorvey had shown them to his daughter. The testimony indicates that the pictures were attached for illustrative purposes. Ms. McCorvey testified that when her two-year-old daughter came home singing the lyrics to the music of this group, and given Ms. McCorvey's discovery of Mr. McCorvey's sexual behavior with his secretary, and group sex with a stripper, and casual sexual exploits with other women, she did not believe that Mr. McCorvey had the "ability to discern" when he was doing something even unintentionally. She testified that the group "Outkast" represented Mr. McCorvey's errant lifestyle, behavior that she had proved in court, that the music denigrated marriage, and it was not appropriate for her daughter to be exposed to it and learn the lyrics.

Ms. McCorvey articulated cogently the link between the group, the music, the photographs, the care of her daughter, and the fact that because of Mr. McCorvey's lifestyle, her daughter was now "bounced from house to house." She stated that she could no longer sit back and let things happen to her daughter; that the music was disrespectful and representative of Mr. McCorvey's behavior; that the pictures were attached to her brief to show the judge what the group was all about. Given the facts and circumstances in this case and the nature of these proceedings, we do not find an abuse of discretion.

17

### *Motions on Visitation*

In a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child. La.Civ.Code art. 131. Mr. McCorvey cites the joint custody article, La.R.S. 9:335, which in pertinent part requires an award of joint custody *except for good cause shown*, frequent contact with both parents, and equal sharing of physical custody *to the extent it is feasible and in the best interest of the child.* However, where Mr. McCorvey deems his own "parental authority" paramount, as the testimony shows, he does not cite to subsection (B)(3) of that article, which provides that the *domiciliary* parent shall have authority to make all decisions affecting the child unless ordered otherwise. Moreover, all major decisions made by the *domiciliary* parent concerning the child are presumed to be in the best interest of the child. La.R.S. 9:335B(3).

"Under La.Civ.Code art. 131, decisions regarding custody of the children are made with the best interest of the child being paramount." *Aucoin v. Aucoin*, 02-756, pp. 5-6 (La.App. 3 Cir. 12/30/02), 834 So.2d 1245, 1249. Under La.Civ.Code art. 134 a number of factors are listed for consideration in making the best interest determination. In *Hawthorne v. Hawthorne*, 96-89 (La.App 3 Cir.), 676 So.2d 619, *writ denied,* 96-1650 (La. 10/25/96), 681 So.2d 365, we held that these factors are merely suggested factors; the trial court is free to use other factors to make its determination; the court should consider the totality of the facts and circumstances in its analysis of the best interest of the child. *Id.* "Additionally, the list is not exclusive and the trial court is to be given great discretion as to the weight of the relevant factors used. La.Civ.Code art. 134, Comment (b)." *See Aucoin,* 834 So.2d at 1249.

The burden of proof on a party seeking to modify a prior permanent custody award is dependent on the nature of the underlying custody award. Custody

awards are commonly made in two types of decisions. The first is through a stipulated judgment, such as when the parties consent to a custodial arrangement. The second is through a considered decree, wherein the trial court receives evidence of parental fitness to exercise care, custody, and control of a child. *Evans v. Lungrin*, 97-0541, 97-0577 (La. 2/6/98), 708 So.2d 731. *See also, Aucoin*, 834 So.2d 1245.

"When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child." *Bergeron v. Bergeron*, 492 So.2d 1193, 1200 (La.1986). Also, "there must be a showing of a change in circumstances materially affecting the welfare of the child before the court may consider making a *significant* change in the custody order." *Id.* at 1194 (emphasis added).

However, "[i]n cases where the original custody decree is a stipulated judgment, such as when the parties consent to a custodial arrangement, and no evidence of parental *fitness* is taken, the heavy burden of proof enunciated in *Bergeron* is inapplicable." *Aucoin,* 834 So.2d at 1248 (emphasis added), *quoting Hensgens v. Hensgens*, 94-1200, pp. 6-7 (La.App. 3 Cir.), 653 So.2d 48, 52, *writ denied*, 95-1488 (La. 9/22/95), 660 So.2d 478. *See also, Evans*, 708 So.2d 731. Where the *Bergeron* burden is inapplicable, the party seeking to modify the custody arrangement need only prove a change in circumstances since the original decree and prove that the new custody arrangement would be in the best interest of the child. *Aucoin,* 834 So.2d 1245; *See also, Weaver v. Weaver*, 01-1656 (La.App. 3 Cir. 5/29/02), 824 So.2d 438; *Hensgens*, 653 So.2d 48; *Evans,* 708 So.2d 731.

19

In this case, even though the parties had difficulty in agreeing on the specifics of visitation in the joint custody plan, and the parties ultimately left the drafting of the plan to Judge Genovese, the resulting custody decree was a "hybrid" judgment wherein the parties consented to a custodial arrangement with Ms. McCorvey designated as the primary domiciliary parent. The judgment drafted by Judge Genovese was not based upon parental *fitness*. Thus, the heavy burden of proof rule enunciated in *Bergeron* was not applicable when Judge McGee heard argument on modifying Judge Genovese's custody order. Moreover, Judge McGee did not make *significant* changes in the custody order, leaving domiciliary custody with the mother and making *minor* reductions in the father's visitation.

In the present case, we find that the change in circumstance requirement is fully satisfied by the escalating pattern of negative behavior on the part of Mr. McCorvey, evidenced by the events leading to the motion and finding of contempt, by a cumulation of incidents of very poor judgment on Mr. McCorvey's part, and by recent testimony and judgments illuminating past behavior. Judge McGee, in modifying Judge Genovese's joint custody order, issued written reasons as follows:

> It is obvious that this judgment, signed June 3, 2003, was actually drafted by the Judge during a time when the parties had a more "amicable relationship". . . . As a result of a recusal by Judge Genovese (and the other two judges of the 27th Judicial District Court) the undersigned is called upon to decide whether the parties have violated the provisions of that Order, and whether the Order should be expanded, or restricted, or maintained as is.
>
> In connection with the issues presented, the Court has had the opportunity to hear lay testimony as well as expert testimony, and perhaps even more importantly, has had the opportunity to hear and see the litigants, both of whom are practicing attorneys. In this Judge's thirty years as a practicing attorney and almost ten years on the bench, I cannot recall any domestic litigation which has risen to the level of hostility such as I have witnessed herein. On the one hand the Court would characterize the mother, Shaunn Caillier-McCorvey Harden, as apparently being an

individual who started off her relationship with her husband, Derriel C. McCorvey, as one who was quite docile and submissive. Now, for obvious reasons, she has become an individual best described by the phrase "I am sick and tired of it and I am just not going to take it anymore." The defendant on the other hand, during the entirety of the trial thus far, appears to be an individual who unfortunately has brought his "football mentality" into play, both during and after the marriage. The evidence against the defendant, from the testimony of the witnesses, as well as the Court's observation of the defendant in open court, leads the Court to but one conclusion . . . that the defendant is domineering, controlling, possessive, and selfish. His words, his body language, his facial expressions, his tone of voice, etc., suggests that without any doubt whatsoever the defendant is overly aggressive and combative. The Court is satisfied that the defendant was in all likelihood the aggressor in the incident between himself and the plaintiffs' current husband, Michael Harden, that the defendant probably did and does have problems with his daughter playing with "white dolls", and that the defendant probably was guilty of exposing his daughter to "so called music" that is hardly fit for adults, most [sic] less babies (and in the future adolescents). The defendant does not have his child's best interest at heart in his actions and attitudes thus far, and it is obvious that he wishes to dominate her every thoughts, words, and deeds, leaving no room for the more responsible/balanced upbringing that the mother seeks. The Court senses that the defendant is more interested in the "almighty I" than he is in "what's best for his little baby girl." There is no doubt but that this defendant would benefit from such programs as the Anger Management Program . . . .

In accordance with the above, the Court finds that the plaintiff . . . is not guilty of any contempt relative to the Court's custody orders, however, the defendant is. In effect, Mr. McCorvey has not only violated the language of Judge Genovese's orders, but he has likewise violated the "spirit" of same. The Court will defer imposition of penalties relative to said contempt until the conclusion of all litigation between the parties. . . . In accordance with the above, the Court will somewhat reluctantly maintain the previously ordered joint custody and will certainly maintain the mother as the domiciliary parent. That having been said however, the Court will amend the visitation provisions so as to allow visitation between the child and the father every other weekend from Friday at 5:00 p.m. to Sunday at 5:00 p.m. The Court will also adjust the summer vacation schedule to allow the child to spend one (1) week with the father during the summer months of June, July,

and August, in addition to his regular scheduled weekend visitation. If either of the three summer weeks falls on the father's regularly scheduled weekend visitation, then in that event the visitation is not to be expanded to nine (9) days – it being the Court's opinion that this is too long a period of time for this young child to be away from her mother. . . .

All other provisions of the original visitation plan, as setup by Judge Genovese, not in conflict herewith, shall be maintained . . .

The record reveals that Judge McGee was more than justified in his remarks and actually charitable in omitting the details of Mr. McCorvey's many transgressions.

Prior to Judge Genovese's June 3, 2003 custody order, the parties were evaluated by Dr. Maureen Brennan, a court appointed psychologist. Mr. McCorvey asserted that the report of Dr. Brennan "recommended a balanced and flexible visitation schedule, with gradually expanding visitation." However, she also stated that it depends on how much conflict there is and how well the child is adjusting to each parent. Also, at the hearing leading to Judge Genovese's order of June 3, 2003, Dr. Kenneth Bouillion was accepted as an expert in the field of clinical child psychology. He stated that very young children need a normal daily routine with the most important psychological factors being security and continuity of care with the primary caretakers. He said the parents must communicate really well and put the child's interests first because the child picks up on the conflict between these parents.

Dr. Bouillion further stated that equal or near-equal sharing of a child Darian's age (one and three quarters years old at the time) would lead to regression in terms of the immaturity of the child, an increase in clinginess, problems sleeping, separation issues. He stated that when such children get older, they get a glazed over look, lose things, leave things at both places, and get washed out emotionally. Dr. Bouillion intimated that in this case involving conflict and poor communication, he

22

would not be surprised to hear of night crying and regression in toilet training, which was the testimony herein.

Dr. Bouillion stated that he had read depositions and talked with the mother. The mother voiced concerns that the father had watched x-rated videos with the little girl present; she told him about nudity, general vulgarity of speech, skin color issues, general lack of sensitivity to the little girl's emotional state. He said that contrary to Dr. Brennan's report, he would have made a list of "don'ts" in the report as to those issues. Dr. Bouillion further stated that he helped write the statute on joint custody, and he thought the joint custody philosophy at that time was about having the visiting parent participate more, with short frequent visits, not overnight extended visits when the child is very young. He stated, "Children just can't live in two places very easily when they are that young without some serious consequences."

Since the 2003 custody order of Judge Genovese was issued, Mr. McCorvey has been found in contempt twice. The second instance of contempt involved the order regarding racial slurs and profanity and threats in the child's presence. This behavior was witnessed and testified to by five adults. Mr. McCorvey has also demonstrated an inflexibility regarding the child's toys and his views on cultural diversity, upsetting the child, making the exchange of custody very stressful, all indicating that he does not have the best interest of the child at heart. He has exposed his child to radio music by the group "Outkast" and told her that the song "Hey Ya" is a "good song" in spite of the fact that the song advocates sex in the back of a car using explicit, sexual, slang terminology unfit for a child and offensive to the sensibilities of many adults. Yet, this little girl was learning the lyrics.

While Mr. McCorvey denies having ever purchased the music, the CD's were entered into the record, and this court has observed other titles such as "Spread" and "Where Are My Panties." The words to these "songs" include profanity and

23

detail exactly what the titles indicate. They are audio pornography. By association, any father who approves the music of this group for his little girl is exercising extremely poor, and detrimental, judgment. Given the influence that music has on children and adults alike, the messages the child will receive by the time she reaches puberty are ones we fear to contemplate. We will not tread into the mine-ridden field of censorship or dictate the tastes of consenting adults regarding their individual affinity for a particular type of music, but the trial court is in the position of deciding what is in the best interest of this little girl, and Mr. McCorvey's behavior in this regard is particularly detrimental to this child. These events are indicative of an escalating pattern of negative behavior constituting a change in circumstances sufficient to modify the custody order.

Moreover, there was testimony from the maternal grandmother regarding the heavy-handedness of the father. She reported that he not only took toys away from his daughter during an already difficult custody exchange and forbade her to play with white dolls, but that he also force-fed the little girl, boiled her meat, evidenced by photographs in the record, refused to take her cereal with him or buy foods that she liked, refused to buy diapers because there were some already in the house, even though the wrong size. The grandmother, who kept the child during the day, also testified that the little girl would not eat meat, a problem the grandmother thinks is related to the father's cruel joke about killing her Easter chicks and making chicken nuggets out of them. While there are no doubt thousands of grandmothers who disagree with their son-in-laws' methods of child rearing and child care, the picture emerging here under this collective testimony is that Mr. McCorvey exercises very poor judgment where his daughter is concerned, traversing the spectrum from cruel humor to psychological intimidation.

24

With regard to racial identity, there was testimony indicating Mr. McCorvey felt his daughter was "too bright" and that she was going to have "to color up", that he had a preference as to what color she was, that he preferred that she be darker-skinned, instead of light-skinned like her mother. The record is replete with evidence of Mr. McCorvey's heavy-handedness and transgressions. Additionally, he has entered into agreements and distributed and converted community funds in defiance of court orders, has been ordered to pay fines, and has been sentenced to jail twice for contempt of court. There was testimony that he alienated community property, that he refused a sale of the family home that one year later sold for $25,000 less, and that he cost the Plaintiff an associate's position with a law firm by intimidating her future employer in public.

In addition to these events, we have new testimony from the two clinical psychologists, Dr. Brennan and Dr. Bouillion, which led to the current modification of custody now on appeal. Before testifying, Dr. Bouillion sat through over six hours of examination and cross-examination of the parties and witnesses in the contempt issue and the custody issue, and he also observed Mr. McCorvey in the role of witness, party, and attorney on his own behalf. Dr. Bouillion indicated that Mr. McCorvey's examination of witnesses in the courtroom strongly implied that Mr. McCorvey believed that his parental prerogative should subordinate all other authority. Dr. Bouillion further testified as follows:

> A.  . . . . I saw a lot today that I didn't like. . . . number one, the issue of the language, the cursing, the physical posturing that was discussed . . . . that's very frightening for a child of this age, and I'd like to explain a little bit about that, because what I think is the issue of that kind of physicality and emotionality between family members that this child loves, is more strongly impacted on her because of her age. She's not quite three years old, she's able to understand a good bit, what's said, but she also sees the feeling. Witnesses described her being

distressed, crying, wanting to bring toys and not bring toys, and being particularly distressed about her dad's opinion, that she was intimidated by his anger. And the picture that I got is that the father makes choices and makes decisions about how he wants things to be at his house, and he's trying to keep that clearly separated from the rest of her life, and she spends more of her time with her mother . . . and they have different lifestyles and different selection of toys and different issues, like diversity or culturalization, and the meaning of blackness and how black is bright, and how black is black and how bright is bright, and those issues. Now, what's terribly important is that at two years and three quarters, the process of identification starts to take place, and there's something that's called incorporation. That's a very basic thing that occurs at that time. I'll give you a good example from my second son. When he was two years and ten months old, he started doing this (indicating), taking his left hand and rubbing his cheek as though he had a beard like his father. That's why little kids walk like their parents, they talk like their parents. That incorporation is very powerful. This is a little girl who's trying to learn how to be a little girl and a young woman in the world. She has her mother and the other female figures in her mother's family, and she has her dad, also, talking to her about how she should act as a little girl, and what she should play with and what she should do. So that process of incorporation is sort of the foundation of identification. It's also the foundation of what we call adequacy or positive self-esteem. The very basis of self-esteem is being set now. Children at two years of age, who have this kind of dissidence, these kinds of differences of opinion between their parents, it leads to problems of self-doubt and problems of autonomy, the inability to make choices . . . . Three years of age we have identification. Little boys learn how to be little boys, little girls learn how to be little girls. They also have a sense of conscience, they know the difference between right and wrong, they make choices, and that's when they start to have initiative, interaction in the world. And what I was distressed by the most was that . . . I didn't hear enough talk about the child's wishes and concerns being expressed, and we want the child to be able to choose toys and select things. And obviously . . . in transition . . . moving from one family to the other, the child is more comfortable if she can take items, clothes, her favorite tennis shoes,

her favorite toys, whatever she's into playing at that moment, to the other home. It facilitates that. We call that transitional objects . . . . They need that to make them make that transition and feel comfortable. . . . And so she's trying to make choices and be comfortable and secure and I was distressed that I heard a lot of . . . testimony about crying when she left and the difficulty that they have in separating from the mother . . . and going with the dad. My big concern was this isn't just humor. This isn't funny. It's not about white dolls or black dolls. It's more about all these important psychological processes that are being established and I was sitting there thinking, if I'm in practice in ten years, I'm going to see this kid when she's thirteen, and she's going to be acting out . . . . She's going to rebel . . . . I'm very distressed about that . . . . The parents need to get together on what is African/American, what is that and you know, this is a diverse society. We live in America where we're all turning brown, you know, and we have to learn to be comfortable with each other, and let her choose her own identity. The dad can't force it on her . . . We can't change the color of her skin. She is what she is. . . . I was really concerned that this is a fight about what kind of female we're going to have. And it's just starting and this . . . is serious, because what we do at two and a half and three and four, determines so much about what's going to happen when she hits puberty and God forbid the middle of adolescence, when she's fifteen, sixteen, thinking who am I, where do I come from. . . . I guess I'm emotional about this, but as a child psychologist, I didn't like sitting through this stuff for six hours, and it wasn't fun and games to me at all. This is serious. I've been in practice thirty years, and I've lived to see this through generations, and I don't like it. And these are intelligent parents, they're well educated, and I feel strongly that the Court should order them to co-parenting classes . . . find a professional that they can work with.

Dr. Bouillion further testified that the chest-to-chest and nose-to-nose confrontation described by the witnesses, the physicality of it, and the violence of the words would terrify a child of this age and is clearly detrimental to her development. He stated that the conflicts stop her development, she gets anxious and frightened, confused about what she can and cannot bring. She cannot use the transitional

27

objects that make her feel secure, so she has to somehow think how to cope. Thus, a child normally just placates the aggressor which results in a split personality; she becomes one way at one house and another way at the other house. Dr. Bouillion stated that she sounded like a beautiful little girl with wonderful things going for her but the problems are serious. He further testified regarding the language and confrontational behavior:

A.   The belligerence and then the "N" word. I mean that's about as hard as you can put somebody down, from one black male to another.

Q.   And then to emasculate them with the words "you're hiding behind women." . . . . What is the effect of that?

A.   That men are more powerful than women and that men should rule the world. It's like the caveman philosophy sort of.

Q.   What effect does that have on the development of a three year old girl?

A.   As a girl . . . it makes her doubt herself, slows her development down, and impacts her ability to make choices, impacts her self-esteem or adequacy. This can't keep going on.

Dr. Bouillion further testified that the lyrics of the song "Hey Ya" were well beyond what a child should hear and not a good role model for a little girl in our society. Judge McGee, as Judge Genovese before him, questioned Dr. Bouillion about specifics, trying diligently to fashion an order that would reflect the best interest of the child. Dr. Bouillion stated that the exchange is not the time to sort out problems, that the child should take transitional objects, whatever she is close to at that point in time, to make her feel more comfortable and secure. In spite of all of this testimony, Mr. McCorvey repeatedly cross-examined Dr. Bouillion regarding Defendant's own "parental authority," indicating an unreasonable persistence and

28

determined refusal to consider expert opinion regarding the best interests of his daughter.

Regarding custody, Dr. Bouillion testified that Mr. McCorvey's Thursday to Sunday visitation every other weekend and an overnight visit mid-week in the off week was instituted too soon for a child that young. He stated that under the best circumstances, where you have intelligent, well-educated parents who live close together, *and*: (1) minimal conflict between the parents; (2) cooperation; and, (3) communication between the parents, then extensive visitation is preferable at age six or seven. If all factors are present, in grammar school one moves toward a 60/40 child-sharing schedule and perhaps a 50/50 schedule in junior high school. However, in the present case, Dr. Bouillion stated, you have intelligent, educated parents, but none of the three factors.

Dr. Maureen Brennan, who examined the parties prior to Judge Genovese's order and issued a psychological report, gave live testimony at the latest custody hearing before Judge McGee. Mr. McCorvey examined Dr. Brennan as follows:

> Q. Okay, okay. Dr. Brennan, if I told you that, that there has been, uh, no problems, uh, with the, uh, care exercised by me, during my visitation with my daughter, would you be opposed to the expansion of additional one day during the week, uh-uh-uh, with my daughter?
>
> A. As I indicated to you, I haven't seen your daughter, and you know, in general . . . the rule of thumb is that any increase is gradually. It comes when there are no problems, expands with the age of the child. I told you that I don't have problems adding some days. I have real difficulties with a very young child, and this child is till [sic], as I understand, very young – three last week. . . . expanding overnights, you know, for that in between time . . . . in between weekend visits, is a problem to me. I don't think kids need that – to live out of a suitcase type thing. . . .

Dr. Brennan testified repeatedly that she could not make recommendations without knowing what was going on, and that given the fact that they were back in court, "there's probably still a lot of conflict which concerns me."

Judge Genovese issued a four-page custody order, setting forth a specific visitation schedule for regular visitation and summer visitation, and a daily and hourly schedule for holidays including Christmas, Easter, Thanksgiving, Mardi Gras, Martin Luther King Day, Mother's Day, Father's Day, and the child's birthday. Judge McGee modified only the regular and summer visitation and upheld all other provisions of Judge Genovese's order "not in conflict herewith." In fact, Judge McGee increased the summer visitation.

More specifically, in June 2003, Judge Genovese awarded the father two weeks of summer vacation with the child: one week in July, and one week in August. This visitation was to prime all other regular visitation. By contrast, Judge McGee awarded the father three weeks of summer vacation with his daughter: one week in June, one in July, and one week in August. However, because of the testimony he heard, Judge McGee was of the opinion that the child was too young to be away from her mother for an extended period of time, and he ordered that Mr. McCorvey's summer vacation weeks could not be taken alongside his regular weekend visitation resulting in a nine-day period for the child to be away from her mother.

The only other specific change that Judge McGee made to the custody order was to reduce the regular overnight visitation by two days. More specifically, Judge Genovese had awarded Mr. McCorvey overnight visitation every other weekend, from Thursday at 6:00 p.m. to Sunday at 6:00 p.m.; and on the "off" week, he awarded the father one overnight visitation from Wednesday at 6:00 p.m. to Thursday at 6:00 p.m. (altering the exchange time to 5:00 p.m. during the fall months). Judge McGee's order maintained the father's every-other-weekend

overnight visitation but set it from Friday at 5:00 p.m. to Sunday at 5:00 p.m., rather than Thursday to Sunday, and he deleted the one overnight visit in the middle of the "off" week. These minor changes are consistent with the testimony of the experts who agreed that overnight visitation by a non-domiciliary parent should be limited in the cases of the very young, especially under the circumstances of this case.

The standard of review in child custody matters is clear. "The trial court is in a better position to evaluate the best interest of the child from observances of the parties and witnesses; thus, a trial court's determination in a child custody case is entitled to great weight on appeal and will not be disturbed unless there is a clear abuse of discretion." *Aucoin*, 834 So.2d at 1248, *quoting Hawthorne*, 676 So.2d at 625, *writ denied*, 96-1650 (La. 10/25/96), 681 So.2d 365. There is no abuse of discretion in the trial court's judgment.

IV.

**CONCLUSION**

Accordingly, because Ms. McCorvey has shown an escalating pattern of behavior on the part of Mr. McCorvey that is deleterious to the child and constitutes a change in circumstances sufficient to meet the heavy burden of *Bergeron*, even though she is not required to do so, and where she has shown that modifying the visitation provision in the joint custody order is in the best interest of the child, we affirm the judgment of the trial court on visitation. Likewise, we affirm the trial court on the issues of venue and contempt of court for the reasons stated.

**AFFIRMED.**

31